Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Laura E. Goolsby (SBN 321721)
Laura.Goolsby@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:  (310) 556-4811
Facsimile:  (310) 943-0396

Russell D. Paul (*pro hac vice admission forthcoming*)
rpaul@bm.net
Amey J. Park (*pro hac vice admission forthcoming*)
apark@bm.net
Abigail J. Gertner (*pro hac vice admission forthcoming*)
agertner@bm.net
BERGER MONTAGUE P.C.
1818 Market Street, Suite 3600
Philadelphia, PA  19103
Telephone:  (215) 875-3000
Facsimile:  (215) 875-4604

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARGARET BARNES, ERIC SENKYRIK, MICHAEL HOGAN, and SHARON JACKSON, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> FORD MOTOR COMPANY, <br><br> Defendant. | Case No.: <br><br> **CLASS ACTION COMPLAINT FOR:** <br><br>    (1)    Breach of Express Warranty <br>    (2)    Breach of Written Warranty under the Magnuson-Moss Warranty Act <br>    (3)    Breach of Implied Warranty of Merchantability <br>    (4)    Breach of Implied Warranty under the Magnuson-Moss Warranty Act <br>    (5)    Breach of Express Warranty under Tennessee Law <br>    (6)    Breach of Implied Warranty of Merchantability under Tennessee Law <br>    (7)    Violations of the Tennessee Consumer Protection Act |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(8)     Breach of Express Warranty under Texas Law
(9)     Breach of Implied Warranty under Texas Law
(10)    Violations of the Texas Deceptive Trade Practices Act
(11)    Breach of Express Warranty under Florida Law
(12)    Breach of Implied Warranty under Florida Law
(13)    Violation of Florida Deceptive and Unfair Trade Practices Act
(14)    Breach of Express Warranty under Nebraska Law
(15)    Breach of Implied Warranty of Merchantability under Nebraska Law
(16)    Violation of Nebraska Consumer Protection Act
(17)    Unjust Enrichment

**DEMAND FOR JURY TRIAL**

1         1.     Plaintiffs Margaret Barnes, Eric Senkyrik, Michael Hogan, and Sharon
2   Jackson ("Plaintiffs") bring this action for themselves and on behalf of all persons
3   in the United States who purchased or leased any 2017-2019 Ford Fiesta and 2017-
4   2018 Ford Focus vehicles equipped with DPS6 dual clutch transmissions (the
5   "Powershift Transmission" or "Transmission") (collectively, "Class Vehicles")
6   designed, manufactured, marketed, distributed, sold, warranted, and/or serviced by
7   Ford Motor Company ("Ford" or "Defendant"). Plaintiff alleges as follows:

### INTRODUCTION

9         2.     Ford designed and marketed its "PowerShift Transmission" as a more
10  advanced and fuel-efficient alternative to a traditional manual or automatic
11  transmission, also known as an automated manual transmission. Theoretically, an
12  automated manual transmission should have the convenience of an automatic
13  transmission without sacrificing the fuel efficiency and shift speed of a manually
14  shifted vehicle. In practice, however, Ford's PowerShift Transmission is plagued
15  by numerous problems and safety concerns.

16        3.     The PowerShift Transmissions in the Class Vehicles suffer from a
17  defect that causes, *inter alia*, transmission slips, bucking, kicking, jerking, harsh
18  engagement, premature internal wear, sudden acceleration, delay in downshifts,
19  delayed acceleration, difficulty stopping the vehicle, and eventually catastrophic
20  transmission failure (the "Transmission Defect"). The Transmission Defect is
21  caused by design, material, manufacturing, and/or workmanship defects of the
22  transmission's "dry" clutches system which cause clutches to overheat and fail, as
23  well as damage other transmission components. Moreover, the Transmission Defect
24  may be exacerbated by improper programming in the Transmission Control Module
25  ("TCM"), the computer which controls the automatic shifting of the Powershift
26  Transmission. Finally, the Transmission Defect is also the result of manufacturing

CLASS ACTION COMPLAINT

1  defects with other components within the Powershift Transmission, as described
2  further herein.

3      4.      Ford has never acknowledged publicly that the Transmission Defect
4  exists. To the contrary, Ford actively concealed, and continues to conceal, the
5  Transmission Defect by, among other things, telling customers that the symptoms
6  associated with the Transmission Defect were "normal driving conditions." Ford
7  issued multiple Technical Service Bulletins ("TSBs") to dealers but never directly
8  notified consumers of known problems with the PowerShift Transmission.
9  Additionally, despite numerous TSBs, a well-known legal settlement,[1] and
10 pervasive press coverage[2] regarding the very same PowerShift Transmission and
11 Transmission Defect as those in Ford vehicles with earlier model years than the
12 Class Vehicles, Ford continued to sell and lease the Class Vehicles with the
13 defective PowerShift Transmission without informing consumers of such defect.
14 The Transmission Defect has no known repair. Ford internally acknowledges that
15 there is no permanent fix for the PowerShift Transmission that will eliminate the
16 Transmission Defect. However, it continued to manufacture and distribute Class
17 vehicles with the defective PowerShift Transmission through the 2019 model year.

18     5.      None of the publicly available information that discussed the
19 Transmission Defect disclosed, fully or at all, the material facts known only to Ford,
20 including that the PowerShift Transmission had serious problems since its early
21 development that Ford simply was unable to fix and that rendered the Class
22 Vehicles unsafe to drive. The PowerShift Transmission was a new technology to

---

[1] *Vargas v. Ford Motor Company*, C.D. Cal. Case No. 2:12-cv-08388-AB-FFM. (The class vehicles in this lawsuit were 2012 through 2016 Ford Focus and Ford Fiesta Vehicles. The class settlement in this litigation was finally approved on March 5, 2020.)

[2] *See, e.g.,* "Ford workers break their silence on faulty transmissions: 'Everybody knew'," DETROIT FREE PRESS, Dec 5, 2019, updated Dec. 14, 2019, https://www.freep.com/in-depth/money/cars/ford/2019/12/05/ford-focus-fiesta-dps-6-transmission-problems/4243091002/ (last visited June 7, 2022).

Ford that Ford rushed to the market without disclosing the problems described above so that Plaintiffs and the Class could make informed purchasing decisions.

6.    Partial statements in the market about the performance of the PowerShift Transmission do not excuse Ford's failure to disclose. Only Ford knew the full truth about the Transmission Defect. It was Ford's obligation to disclose the material facts that only Ford knew about.

7.    The Transmission Defect causes unsafe conditions, including, but not limited to, Class Vehicles suddenly lurching forward, delayed acceleration, and sudden loss of forward propulsion. These conditions present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration. For example, these conditions make it difficult to safely merge into traffic. Even more troubling, the Transmission Defect can cause the vehicle to fail to downshift and decelerate when the brakes are depressed. As a result, Plaintiffs and Class Members have experienced their cars lurching forward into intersections at red lights due to the failure of their braking efforts to stop the car.

8.    The transmission in each of the Class Vehicles is the same DPS6 dual clutch transmission, and is the same transmission as used in previous model years. As such, the Transmission Defect is inherent in each of the Class Vehicles and is present at the time of sale.

9.    Even with extensive knowledge of the Transmission Defect, Ford has nevertheless failed to provide any final solution to consumers who purchased or leased Class Vehicles. Further, Ford has not addressed the source of the defect for those consumers, including for those whose vehicles are still under warranty. In fact, Ford merely performs temporary stop-gap remedies such as reprogramming the TCM. This reprogramming merely "resets" the software specifications on the transmission and does not prevent the PowerShift Transmission from further exhibition of the Transmission Defect. Ford may otherwise simply perform ineffective replacement of certain transmission components with similarly defective

transmission components, thereby never actually addressing the cause of the Transmission Defect.

10.   Ford dealerships will also sometimes perform repairs to or replacements of the clutch components of the PowerShift Transmission, but those repairs are likewise ineffective, and, may require waiting up to six months for replacement parts to become available, if not longer.

11.   Indeed, this pattern is so prevalent that Ford prepared a handout for its dealers entitled "PowerShift 6-Speed Transmission Operating Characteristics." Ford drafted this document and provided it to its dealers to give to customers whose vehicles were exhibiting the Transmission Defect, in an apparent attempt to induce customers into believing the problems they were experiencing were "normal driving characteristics." Nothing in this handout discloses that the PowerShift Transmission is defective.

12.   When a consumer's PowerShift Transmission fails after expiration of their vehicle's warranty, the consumer must pay out-of-pocket for the necessary repairs and may still have to return for repeated service visits. These repairs, including clutch and TCM replacements, can total thousands of dollars.

13.   The Transmission Defect prevents Plaintiffs' and Class Members' ability to have safe, comfortable, and expected use of their Class Vehicles and leaves the Class Vehicles incapable of providing safe, reliable transportation.

14.   Based on pre-production testing, including thermal testing, design failure mode analysis, early warranty claims, replacement part orders, and consumer complaints to Ford's authorized network of dealers, as well complaints to NHTSA, Ford was aware of the Transmission Defect in the PowerShift Transmission as early as 2010. Despite being aware of the defect and numerous complaints, Ford knowingly actively manufactured, distributed, and sold the Class Vehicles beginning in 2016. Further, Ford affirmatively omitted and concealed the existence of the Transmission Defect in advertising and manuals to increase profits by selling

additional Class Vehicles at inflated prices. Discovery will show that Ford internally decided that possible permanent solutions would be too expensive to implement before beginning to manufacture the Class Vehicles and instead decided to cease using the PowerShift Transmission in model year 2020.

15.     If Plaintiffs and Class Members had known about the Transmission Defect at the time of sale or lease, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them.

16.     As a result of their reliance on Defendants' omissions, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles are defective, that they overpaid for defective vehicles, and that the Class Vehicles' PowerShift Transmissions increase their chances of being involved in a collision.

## THE PARTIES

### Plaintiff Margaret Barnes

17.     Plaintiff Margaret Barnes is a Tennessee citizen and resident.

18.     On or around October 29, 2019, Plaintiff Barnes purchased a preowned 2017 Ford Focus with approximately 21,000 miles on the odometer from Gossett Ford, an authorized Ford dealership located in Memphis, Tennessee

19.     Plaintiff Barnes purchased her 2017 Ford Focus primarily for personal, family, or household use.

20.     Passenger safety and reliability were important factors in Plaintiff Barnes' decision to purchase her vehicle. Before making her purchase, Plaintiff Barnes researched the 2017 Ford Focus by reviewing the vehicle's CARFAX report, viewing the vehicle's window sticker(s), and inquiring into the vehicle's safety and reliability with the vehicle salesperson, who informed Plaintiff Barnes the vehicle

was indeed safe and reliable. Plaintiff Barnes believed that the 2017 Ford Focus would be a safe and reliable vehicle.

21.   Ford's omissions were material to Plaintiff Barnes. Had Ford disclosed its knowledge of the Transmission Defect before she purchased her 2017 Ford Focus, Plaintiff Barnes would have seen and been aware of the disclosures. Furthermore, had she known of the Transmission Defect, Plaintiff Barnes would not have purchased her vehicle or would have paid less for her vehicle.

22.   In or around July 2021, with approximately 27,000 miles on the odometer, Plaintiff Barnes' transmission began bucking and jerking, as well as failing to accelerate. In fact, several times Plaintiff Barnes' vehicle refused to accelerate and stopped entirely on the freeway. Immediately thereafter, Plaintiff Barnes returned the vehicle to the dealership, which verified the bucking and jerking, only for Barnes to be informed that she needed a new TCM, but she would have to get "in line" as no parts were available.

23.   Thereafter, Plaintiff Barnes contacted Ford's corporate customer service department, as well as the Ford authorized dealer, multiple times looking for resolution and repair. Plaintiff Barnes was told she would just have to continue waiting for the TCM to come in. In February 2022, Plaintiff Barnes stopped driving the vehicle entirely, out of fear for her safety.

24.   Plaintiff Barnes' vehicle has not yet been repaired and has continued to be defective.

25.   At all times, Plaintiff Barnes, like other class members, has attempted to drive her vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Eric Senkyrik**

26.     Plaintiff Eric Senkyrik is a Texas citizen and resident.

27.     On or around January 1, 2017, Plaintiff Senkyrik purchased a new 2017 Ford Focus with from Appel Ford, an authorized Ford dealership located in Brenham, Texas.

28.     Plaintiff Senkyrik purchased his 2017 Ford Focus primarily for personal, family, or household use.

29.     Passenger safety and reliability were important factors in Plaintiff Senkyrik's decision to purchase his vehicle. Before making his purchase, Plaintiff Senkyrik viewed Ford advertising online and on the television and reviewed the vehicle's window sticker(s). Plaintiff Senkyrik believed that the 2017 Ford Focus would be a safe and reliable vehicle.

30.     Ford's omissions were material to Plaintiff Senkyrik. Had Ford disclosed its knowledge of the Transmission Defect before he purchased his 2017 Ford Focus, Plaintiff Senkyrik would have seen and been aware of the disclosures. Furthermore, had he known of the Transmission Defect, Plaintiff Senkyrik would not have purchased his vehicle or would have paid less for his vehicle.

31.     In or around July 2020, with approximately 51,000 miles on the odometer, Plaintiff Senkyrik's vehicle began shuddering, as well as hesitating upon acceleration. As a result, on or around July 28, 2020, the Plaintiff Senkyrik delivered his vehicle to Tipton Ford, an authorized Ford dealership located in Nacogdoches, Texas. The technician "VERIFIED CUSTOMER'S CONCERN OF CLUTCH SHUDDER DURING TAKE OFF." The repair order further noted that the technician "PERFORMED TCM ADAPTIVE RE-LEARN PROCEDURES FOLLOWING IDS INSTRUCTIONS." However, the vehicle was returned to Plaintiff Senkyrik with the shudder still occurring because the shudder was "WITHIN FACTORY SPECIFICATION."

32.     Thereafter, Plaintiff Senkyrik continued experiencing transmission shudder and acceleration hesitation. On or around March 2, 2021, Plaintiff Senkyrik again returned his vehicle to Tipton Ford in Nacogdoches, Texas and again the technician "VERIFIED CUSTOMER'S CONCERN OF CLUTCH SHUDDER." The repair order further noted that the technician "FOLLOWED FORD RECOMMENDED PROCEDURES" but no repairs could be performed because the "CLUTCH SHUDDER [WAS] WITHIN FACTORY SPECIFICATIONS AT [THE] TIME. Plaintiff Senkyrik's vehicle was again returned to him with the transmission shudder and acceleration hesitation still prevalent.

33.     Plaintiff Senkyrik's vehicle has not yet been repaired and continues to be defective.

34.     At all times, Plaintiff Senkyrik, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Michael Hogan**

35.     Plaintiff Michael Hogan is a Florida citizen and resident.

36.     On or around March 6, 2020, Plaintiff Hogan purchased a preowned 2017 Ford Focus with approximately 17,500 miles on the odometer from Autonation Ford, an authorized Ford dealership located in St. Petersburg, Florida.

37.     Plaintiff Hogan purchased his 2017 Ford Focus primarily for personal, family, or household use.

38.     Passenger safety and reliability were important factors in Plaintiff Hogan's decision to purchase his vehicle. Before making his purchase, Plaintiff Hogan viewed Ford advertising online at the manufacturer's website and on the television, reviewed the vehicle's window sticker(s), and spoke to the dealer staff. Plaintiff Hogan believed that the 2017 Ford Focus would be a safe and reliable vehicle.

39.     Ford's omissions were material to Plaintiff Hogan. Had Ford disclosed its knowledge of the Transmission Defect before he purchased his 2017 Ford Focus, Plaintiff Hogan would have seen and been aware of the disclosures. Furthermore, had he known of the Transmission Defect, Plaintiff Hogan would not have purchased his vehicle or would have paid less for his vehicle.

40.     In or around January 2022, with approximately 25,000 miles on the odometer, Plaintiff Hogan began to experience the Transmission Defect. Plaintiff Hogan's vehicle began shaking, shuddering, and rattling, as well as stalling out in traffic. As a result, on or around February 7, 2022, with 25,453 miles on the odometer, Plaintiff Hogan delivered his vehicle to Autonation Ford, located in St. Petersburg, Florida. The technician "road tested and verified [customer's] concern," which was listed as "POSSIBLE TRANNY ISSUE. STUTTERING AND VIBRATION." The dealer replaced the vehicle's clutch and seals and returned it to Plaintiff Hogan. This attempted repair proved to be ineffective.

41.     On or around April 14, 2022, with 27,616 miles on the odometer, Plaintiff Hogan again returned his vehicle to Autonation Ford in St. Petersburg, Florida and again the technician "verified concern" of "CAR SHAKES LIKE CRAZY." The repair order further noted that the vehicle's clutch and seals were again replaced. Plaintiff Hogan's vehicle was again returned to him with the transmission shudder and acceleration hesitation still prevalent. This attempted repair also proved to be ineffective.

42.     Plaintiff Hogan's vehicle continues to shake, shudder, and rattle, as well as stall out in traffic. Plaintiff Hogan's vehicle has not been permanently repaired and continues to be defective.

43.     At all times, Plaintiff Hogan, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

CLASS ACTION COMPLAINT

**Plaintiff Sharon Jackson**

44.     Plaintiff Sharon Jackson is a Nebraska citizen and resident.

45.     On or around May 12, 2018, Plaintiff Jackson purchased a new 2018 Ford Focus from Woodhouse Ford, an authorized Ford dealership located in Omaha, Nebraska.

46.     Plaintiff Jackson purchased her 2018 Ford Focus primarily for personal, family, or household use.

47.     Passenger safety and reliability were important factors in Plaintiff Jackson's decision to purchase her vehicle. Before making her purchase, Plaintiff Jackson visited the Ford dealer and spoke with the salesperson and reviewed the vehicle's window sticker(s). Plaintiff Jackson believed that the 2018 Ford Focus would be a safe and reliable vehicle.

48.     Ford's omissions were material to Plaintiff Jackson. Had Ford disclosed its knowledge of the Transmission Defect before she purchased her 2018 Ford Focus, Plaintiff Jackson would have seen and been aware of the disclosures. Furthermore, had she known of the Transmission Defect, Plaintiff Jackson would not have purchased her vehicle or would have paid less for her vehicle.

49.     In or around August 2019, with approximately 21,500 miles on the odometer, Plaintiff Jackson began to experience the Transmission Defect. Plaintiff Jackson's transmission began shuddering and clicking. As a result, on or around August 6, 2019, Plaintiff Jackson delivered her vehicle to Woodhouse Ford, an authorized Ford dealership located in Omaha, Nebraska. The technician "VERIFIED CONCERN" of "clutch chatter." The repair order further noted that the technician "REPROGRAMMED PCM/TCM TO NEWEST SOFTWARE." However, the vehicle was returned to Plaintiff Jackson with the shudder still occurring because the shudder was "WITHIN SPECS." This attempted repair proved to be ineffective.

50.     Following the attempted repair, Plaintiff Jackson continued experiencing transmission shudder and also began experiencing acceleration hesitation and transmission overheating. On or around April 18, 2022, with 88,681 miles on the odometer, Plaintiff Jackson again returned her vehicle to Woodhouse Ford in Omaha, Nebraska and again the technician "VERIFIED SHUDDER CONCERN." The repair order further noted that the technician "replace[d] clutch and all seals replace[d] both clutch actuators and throw out bearing. Replace[d] both clutch motors/ replace[d] leaking rear main seal." This attempted repair proved to be ineffective.

51.     Despite this repair, Plaintiff Jackson's vehicle continues to suffer from the Transmission Defect and Plaintiff Jackson continues to experience shuddering and acceleration hesitation. To date, Plaintiff Jackson's vehicle has not been permanently repaired and continues to be defective.

52.     At all times, Plaintiff Jackson, like other class members, has attempted to drive her vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Defendant**

53.     Defendant Ford Motor Company is a Delaware limited liability company with its Corporate Headquarters located at 1 American Road, Dearborn, Michigan 48126. Ford Motor Company is registered to do business in the State of California. Ford Motor Company designs and manufactures motor vehicles, parts, and other products for sale in the United States and throughout the world. Ford Motor Company is the warrantor and distributor of the Class Vehicles in California and throughout the United States

54.     At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in California and throughout the United States of America.

55.    In order to sell vehicles to the general public, Defendant enters into agreements with dealerships who are then authorized to sell Ford vehicles to consumers such as Plaintiffs. In return for the exclusive right to sell new Ford vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties Defendant provides directly to consumers. These contracts give Defendant a significant amount of control over the actions of the dealerships, including sales and marketing of vehicles and parts for those vehicles. All service and repair at an authorized dealership are also completed according to Defendant's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), and other documents. Per the agreements between Defendant and the authorized dealers, consumers such as Plaintiffs can receive services under Defendant's issued warranties at dealer locations that are convenient to them.

56.    Defendant also develops and disseminates the owners' manuals, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles. Defendant is also responsible for the production and content of the information on the Moroney Stickers.

57.    Defendant is the drafter of the warranties it provides to consumers nationwide, the terms of which unreasonably favor Defendant. Consumers are not given a meaningful choice in the terms of the warranties provided by Defendant, and those warranties are offered on a "take it or leave it" basis.

## JURISDICTION AND VENUE

58.    This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than Ford, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. § 1332(d)(2)(A).

59.     In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.

60.     Ford, through its business of distributing, selling, and leasing the Class Vehicles, has established sufficient contacts in this district such that personal jurisdiction is appropriate.  Defendant is deemed to reside in this district pursuant to 28 U.S.C. § 1391(a).

61.     This Court has personal jurisdiction over Defendant because it has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in California; and otherwise intentionally avails itself of the markets within California through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary.

62.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions giving rise to the claims occurred in this District.

## **FACTUAL ALLEGATIONS**

63.     For years, Ford has designed, manufactured, distributed, sold, leased, and warranted the Class Vehicles.

64.     Ford marketed and sold thousands of Class Vehicles nationwide, including through its nationwide network of authorized dealers and service providers. Ford sells its vehicles to its authorized dealerships, which in turn sell those vehicles to consumers. After these dealerships sell cars to consumers, including Plaintiffs and Class Members, they purchase additional vehicle inventory from Ford to replace the vehicles sold, increasing Ford's revenues. Thus, Plaintiffs'

1   and Class Members' purchase of Class Vehicles accrues to the benefit of Ford by

2   increasing its revenues. In 2019, Ford reported its revenues as $155.9 billion.[3]

3     65. Ford provides several warranties when consumers purchase Ford-

4   branded vehicles, including a "Bumper to Bumper", 3-year or 36,000-mile

5   warranty, and a Powertrain, 5-year or 60,000-mile warranty. Both of these

6   warranties are part of the New Vehicle Limited Warranty ("NVLW") provided by

7   Ford to purchasers of new Ford-branded vehicles. These warranties are transferrable

8   to subsequent owners, within the stated durational or mileage limits of the

9   warranties.

10     66. The transmission, including "all internal parts, clutch cover, seal and

11   gaskets, torque converter, transfer case (including all internal parts, transmission

12   case, [and] transmission mounts," is covered by both the "Bumper to Bumper" and

13   the Powertrain warranty.

14     67. The NVLW provided by Ford promises that "authorized Ford Motor

15   Company dealers will, without charge, repair, replace, or adjust all parts on your

16   vehicle that malfunction or fail during normal use during the applicable coverage

17   period." Ford also limited the remedy under the NVLW "to repair, replacement, or

18   adjustment of defective parts" and states that "[t]his exclusive remedy shall not be

19   deemed to have failed its essential purchase so long as Ford, through its authorized

20   dealers, is will and able to repair, replace, or adjust defective parts in the prescribed

21   manner."

22     68. Each of the attempted repairs to Plaintiffs' vehicles was provided to

23   Plaintiffs under the NVLW.

24     69. Since at least 2010, Ford has been manufacturing and selling vehicles

25   with the same or substantially similar PowerShift Transmission as those in the Class

26   Vehicles. The Class Vehicles themselves have identical PowerShift Transmissions

27

28   [3] *See* 2019 Ford Annual Report,
https://annualreport.ford.com/Y2019/default.aspx (last visited June 13, 2022).

that do not differ materially from the PowerShift Transmissions installed in previous model years of the same vehicles.

70.     Ford's PowerShift Transmission, while sometimes referred to as an automatic, is actually a set of computerized manual transmissions. It lacks a torque converter, instead using two "dry" clutches to directly connect and disconnect the engine to and from the transmission. Whereas other automated manual transmissions on the market use "wet" clutches bathed in oil, Ford's PowerShift clutches lack the oil pumps and other components of a wet clutch system, and instead operate dry.

71.     Ford designed and manufactured the Class Vehicles' computerized "automated manual" transmissions in an effort to meet heightened governmental and consumer expectations for fuel economy, performance, and efficiency. Theoretically, such a transmission should have the convenience of an automatic transmission without sacrificing fuel efficiency. In practice, however, Ford's PowerShift Transmission has been plagued by numerous problems and safety hazards.

72.     Dating back to at least 2010, Ford was aware of the defects of the PowerShift Transmission. Ford, however, failed and refused to disclose these known defects to consumers. Instead, Ford continued to manufacture and distribute vehicles with the PowerShift Transmission, including the Class Vehicles. As a result of this failure, Plaintiffs and Class Members have been damaged.

**The PowerShift Transmission and Defect**

73.     Discovery will show that the Transmission Defect results from the design and/or poor manufacturing and workmanship of the dry clutches which cause the clutch and other Transmission components to overheat, thus forcing the TCM to "instruct" the clutches to disengage or slow in order to prevent further damage to the transmission. Furthermore, the Transmission Defect may be exacerbated by improper programming and/or calibrating of the TCM. Finally, the Transmission

Defect is also the result of manufacturing defects with other components within the Powershift Transmission, as described below.

74. Traditional manual transmissions use a driver-controlled clutch. By pressing and releasing a foot pedal, the driver engages and disengages the engine from the transmission, allowing the vehicle to travel smoothly while the driver manually changes gears.

75. In contrast, typical automatic transmissions free the driver from operating the clutch through the use of a fluid-filled device called a torque converter. The torque converter substitutes for the manual transmission's clutch, transmitting power from the engine to the transmission through a fluid medium.

76. While typical automatic transmissions offer increased convenience, they are generally less fuel-efficient and slower-shifting than their manual counterparts. This is because the torque converter transfers power less efficiently than a clutch. As a result, Ford marketed and sold its PowerShift Transmission as a "best of both worlds" alternative, offering a manual transmission's fuel economy with an automatic transmission's ease of operation and shift quality.

77. Ford's PowerShift Transmission, while sometimes referred to as an "automatic," is actually a set of computerized manual transmissions. It lacks a torque converter, instead using two "dry" clutches to directly engage and disengage the engine with and from the transmission. Whereas similar "automated manual" transmissions on the market use "wet" clutches bathed in oil, Ford's PowerShift Transmission clutches lack the oil pumps and other components of a wet clutch system, and instead operate "dry."

78. Ford designed the Class Vehicles' computerized "automated manual" transmissions in an effort to meet heightened governmental and consumer expectations for fuel economy, performance, and efficiency. According to Ford's own press release, dated March 10, 2010, "PowerShift with dry-clutch facings and new energy-saving electromechanical actuation for clutches and gear shifts saves

Page 16

CLASS ACTION COMPLAINT

weight, improves efficiency, increases smoothness, adds durability and is sealed with low-friction gear lubricant for the life of the vehicle. This transmission requires no regular maintenance."[4]

79.     Theoretically, an "automated manual" transmission, *i.e.,* the PowerShift Transmission, should have the convenience of an automatic transmission without sacrificing the fuel efficiency and shift speed of a manually-shifted vehicle. In practice, however, Ford's PowerShift Transmission is plagued by numerous problems and safety concerns, rendering the vehicle virtually inoperable.

80.     The Transmission Defect causes unsafe conditions, including, but not limited to, Class Vehicles suddenly lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion. These conditions present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration. As an example, these conditions may make it difficult to safely merge into traffic. Even more troubling, the Transmission Defect can cause the vehicle to fail to downshift and decelerate when the brakes are depressed. As a result, Plaintiffs and Class Members have experienced their cars lurching forward into intersections at red lights due to the failure of their braking efforts to stop the car.

81.     Discovery will show the Transmission Defect also causes premature wear to the PowerShift Transmission's clutch plates and other components, which can result in premature transmission failure and requires expensive repairs, including replacement of the transmission and its related components.

---

[4] *See* MarketScreener.com, "FORD: PowerShift Transmission Production Begins, Driving Ford Small Car Fuel Economy Leadership," https://www.marketscreener.com/quote/     stock/FORD-MOTOR-COMPANY-12542/news/FORD-PowerShift-Transmission-Production-Begins-Driving-Ford-Small-Car-Fuel-Economy-Leadership-13346361/ (last visited June 8, 2022).

82.     The transmission in each of the Class Vehicles is the same DPS6 dual clutch transmission, and is the same transmission as used in previous model years. Moreover, despite extensive knowledge of the Transmission Defect from prior model years, Ford made no changes to the DPS6 dual clutch transmission before manufacturing the Class Vehicles. As such, the Transmission Defect was inherent in each Class Vehicle and was present in each Class Vehicle at the time of sale.

83.     Ford knew about the Transmission Defect present in every Class Vehicle, along with the attendant safety problems, and concealed this information from Plaintiffs and Class Members at the time of sale, lease, repair, and thereafter. In fact, instead of repairing the Class Vehicles, Ford has insisted that the vehicles are working as designed.

84.     If Plaintiffs and Class Members had known about the Transmission Defect at the time of sale or lease, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them.

85.     As a result of their reliance on Defendants' omissions, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles are defective, that they overpaid for defective vehicles, and that the Class Vehicles' PowerShift Transmissions increase their chances of being involved in a collision by overheating, catching fire or catastrophically failing.

**Ford Had Superior and Exclusive Knowledge of the Transmission Defect**

86.     Ford became aware of the Transmission Defect at least as early as 2010, well before Plaintiffs and Class Members purchased their Class Vehicles. Ford learned of the defect through sources such as pre-release evaluation and testing including thermal testing; repair data; replacement part sales data; early consumer complaints made to Ford and/or NHTSA, and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from

Ford dealers; as well as through other internal sources unavailable to Plaintiffs prior to discovery.

87.    While designing, manufacturing, engineering, and testing Class Vehicles in advance of the vehicles' release, Ford would have gained comprehensive and exclusive knowledge about the PowerShift Transmissions installed in those Vehicles. Adequate pre-release analysis of the design, engineering, and manufacture of the PowerShift Transmissions in the Class Vehicles would have revealed to Ford that the design and/or manufacture of the Transmission was defective and susceptible to dry clutch overheating. Indeed, pre-production thermal testing of vehicles with the PowerShift Transmission revealed the Transmission Defect and associated safety risk. Despite this, Ford manufactured hundreds of thousands of vehicles with this defective transmission, including the Class Vehicles.

88.    Indeed, investigation by the Detroit Free Press revealed that Ford had been discussing the Transmission Defect since at least 2010. A 2012 "Lessons Learned" review of the PowerShift Transmission drafted by Ford employees stated "at each early checkpoint, it became more apparent" that the transmissions "were not capable to meet customer expectations."[5]  As reported, "[a] page was devoted to milestone failures with 23 'red' alert issues related to calibration and '115 software changes required before [the] launch" of the 2011 Ford Fiesta with the PowerShift Transmission.[6]

89.    According to one former Ford engineer, design and release engineers, calibration development engines, manufacturing engines, customer service engines and transmission engineers all knew the transmissions were defective. According to the Detroit Free Press's investigation, "Ford engineers and their supervisors

---

[5] *See* Lessons Learned, DETROIT FREE PRESS (July 11, 2019), https://www.freep.com/in-depth/money/cars/ford/2019/07/11/ford-focus-fiesta-transmission-defect/1671198001/ (last visited June 13, 2022).

[6] *Id*.

exchanged emails confirming that a serious problem existed with no identifiable solution."[7]  To extent a solution was possible, it would involve expensive changes, including to contracts with certain suppliers, and such changes were abandoned. Instead, Ford decided to phase out the use of the PowerShift Transmission, which meant it would continue to include the transmission with its known defects in models not yet in production, including the Class Vehicles.

90.    Despite this knowledge, no material change was made to the PowerShift Transmission such that the Transmission Defect was fully resolved. Instead, Ford spent years adjusting the TCM programming and calibration, replacing blown clutches, and fixing seal leaks as stop-gap measures that did not remedy the Transmission Defect.

91.    Instead, Ford marketed the PowerShift transmission in Class Vehicles as one that "feels like an automatic and is designed to provide fuel efficiency and performance."

92.    Indeed, on August 14, 2019, Ford issued a press release stating "[b]ased on internal and external data, Focus and Fiesta vehicles with automatic transmissions built since the second half of 2015 – and earlier models that have received components and software updates – perform well and have competitive levels of satisfaction."[8]   This statement suggested that Ford had remedied the Transmission Defect in PowerShift Transmissions. However, by this time, Ford was already well-aware of continuing consumer complaints about the Transmission Defect in model year 2017 and newer vehicles, as well as its own internal data regarding its decision not to implement a permanent repair and, as a result, to eventually phase-out use of the PowerShift Transmission in future vehicles.

---

[7] *Id.*

[8] "Ford Statement on Latest DPS6 Customer-Satisfaction Actions," available at https://media.ford.com/content/fordmedia/fna/us/en/news/2019/08/14/ford-statement-on-dps6-customer-satisfaction-actions.html (last visited June 17, 2022).

93.     Moreover, when questioned by reporters or others investigating the Transmission Defect, Ford touted the fact that NHTSA had not directed them to issue a recall and that no government had found a problem with the PowerShift Transmission. In fact, the Federal Court in Australia declared in a consent judgement that Ford Motor Company of Australia Limited "engaged in unconscionable conduct in the way it deal with complaints about PowerShift transmission cars, and order Ford to pay $10 million in penalties."[9]  In particular, the Court found that "Ford communicated with its dealers about the quality issues on multiple occasions, but did not provide adequate information about the quality issues to the customers who complained to Ford about their vehicles."[10] Moreover, despite knowing that the Transmission Defect's symptoms were intermittent, Ford demanded that customer prove they were experiencing problems in order to secure warranty repairs and further blamed customers' driving styles for the shuddering and vibration they were experiencing.

### NHTSA Complaints

94.     Federal law requires automakers like Ford to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

95.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.*

---

[9] "Court orders Ford to pay $10 million penalty for unconscionable conduct," AUSTRALIAN COMPETITION & CONSUMER COMMISSION (Apr 26, 2018) https://www.accc.gov.au/media-release/court-orders-ford-to-pay-10-million-penalty-for-unconscionable-conduct#:~:text=The%20Federal%20Court%20has%20declared,pay%20%2410%20million%20in%20penalties (last visited June 13, 2022).

[10] *Id.*

Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety-related, such as spontaneous engine fires.

96. Many Class Vehicle owners and lessees submitted complaints about the Transmission Defect with NHTSA's Office of Defect Investigations ("ODI").

97. From its monitoring of the NHTSA databases, Ford knew or should have known of the many complaints about Transmission Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, Ford that the Transmission Defect is widespread in Class Vehicles, and a safety hazard.

98. The following complaints are a sampling of the scores of available complaints through NHTSA's website, www.safercar.gov, which reveal that Ford, through its network of dealers and repair technicians, was made aware of many transmission failures in Class Vehicles.

**2017 Ford Fiesta**

a. NHTSA ID Number: 11443656, Date Reported: December 13, 2021, Incident Date December 9, 2021, Consumer Location FRANKFORT, KY, Vehicle Identification Number 3fadp4gx3hm****

The contact owns a 2017 Ford Fiesta. The contact stated while driving 65 MPH with the cruise control engaged, the contact depressed the clutch to shift gear however, the clutch seized, and the contact was unable to shift into gear. The contact placed the vehicle into neutral and veered to the side of the road. The contact looked under the hood and smelled an abnormal chemical odor coming from the engine. The contact had the vehicle towed to a local dealer who diagnosed the vehicle with a faulty clutch. The contact was informed that the clutch needed to be replaced. The vehicle was not repaired. The manufacturer was made aware of the failure. The failure mileage was approximately 120,000.

b. NHTSA ID Number: 11364085, Date Reported: October 13, 2020, Incident Date October 11, 2020 Consumer Location STATEN ISLAND, NY Vehicle Identification Number 3FADP4EJ6HM****

ON OCCASION WHILE BACKING UP STEEP AT HOME DRIVEWAY (APROX 15-20 DEGREES) TRANSMISSION SLIPS OUT OF GEAR AND ROLLS FORWARD. STEP ON BRAKE IMMEDIATELY AND INSTANTLY SHIFTS BACK INTO REVERSE. HAS HAPPENED 3-5 TIMES SINCE VEHICLE WAS NEW.

c. NHTSA ID Number: 11352938, Date Reported: September 3, 2020, Incident Date August 28, 2020 Consumer Location HILLSBORO, IL Vehicle Identification Number 3FADP4BJ7HM****

THE CONTACT'S DAUGHTER OWNS A 2017 FORD FIESTA. THE CONTACT STATED THAT WHILE HER DAUGHTER WAS DRIVING AT VARIOUS SPEEDS, THE VEHICLE HESITATED AS SEVERAL TRANSMISSION WARNING LIGHTS WOULD APPEAR ON THE INSTRUMENT PANEL. DUE TO THE FAILURE, THE CONTACT'S DAUGHTER HAD THE VEHICLE TOWED TO AUFFENBERG FORD NORTH, INC. (115 REGENCY PARK, O'FALLON, IL 62269) WHERE THE CONTACT WAS INFORMED THAT THE CLUTCH FAILED INSIDE THE TRANSMISSION AND NEEDED TO BE REPLACED. THE CONTACT WAS INFORMED THAT THERE WERE NO RECALLS ON THE VEHICLE. THE MANUFACTURER WAS ALSO NOTIFIED OF THE FAILURE AND REFERRED THE CONTACT TO NHTSA FOR ASSISTANCE. THE VEHICLE HAD YET TO BE REPAIRED. THE FAILURE MILEAGE WAS APPROXIMATELY 65,000.

CLASS ACTION COMPLAINT

d.  NHTSA ID Number: 11234539, Date Reported: July 24, 2019, Incident Date June 4, 2019 Consumer Location CHARLESTOWN, IN

THE CONTACT OWNS A 2017 FORD FIESTA. WHILE DRIVING VARIOUS SPEEDS, THE VEHICLE LOST POWER WITHOUT WARNING AND WAS DIFFICULT TO RESTART. THE VEHICLE WAS TAKEN TO HERITAGE FORD (LOCATED AT 2075 EDSEL LN NW, CORYDON, IN 47112, (812) 738-3284) TO BE DIAGNOSED. THE DEALER STATED THAT THERE WAS EVIDENCE OF A FAULT CODE; HOWEVER, THE TRANSMISSION CONTROL MODULE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT CONTACTED ABOUT THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 50,000. THE VIN WAS NOT AVAILABLE.

e.  NHTSA ID Number: 11217873, Date Reported: June 4, 2019, Incident Date April 1, 2019 Consumer Location Unknown Vehicle Identification Number 3FADP4EJ8HM****

ON THE CLUTCH IS GOING OUT OF THE TRANSMISSION

f.  NHTSA ID Number: 11170576, Date Reported: January 7, 2019, Incident Date December 10, 2018 Consumer Location WASHINGTON, DC Vehicle Identification Number 3FADP4EJ4GM****

THE CAR JERKS AND SHUTTERS WHEN PRESSING ON THE GAS. THE CAR LOSES POWER AND WILL NOT GO OVER 40-50 MILES A HOURS, WHICH IS VERY DANGEROUS WHEN DRIVING ON THE INTERSTATE. THE CAR IS NOT CHANGING GEAR PROPERLY

g.  NHTSA ID Number: 11164590, Date Reported: January 2, 2019, Incident Date December 28, 2018 Consumer Location TARZANA, CA Vehicle Identification Number 3FADP4EJ1HM******

THE CONTACT OWNS A 2017 FORD FIESTA. ON SEVERAL OCCASIONS, WHILE DRIVING VARIOUS SPEEDS, THE VEHICLE JERKED ABNORMALLY AND STALLED. THE VEHICLE WAS TAKEN TO VISTA FORD WOODLAND HILLS (LOCATED AT 21501 VENTURA BLVD, WOODLAND HILLS, CA 91364, (818) 884-

Page 24

7600) WHERE IT WAS DIAGNOSED THAT THE TRANSMISSION CONTROL MODULE WAS FAULTY; HOWEVER, THE MANAGER STATED THAT THERE WAS NO FAILURE WITH THE VEHICLE. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 18,000 REPORT.

**2019 Ford Fiesta**

h.  NHTSA ID Number: 11427182, Date Reported: July 30, 2021, Incident Date May 1, 2021 Consumer Location MINNEAPOLIS, MN Vehicle Identification Number 3FADP4EJ2KM****

TL* The contact owns a 2019 Ford Fiesta. The contact stated while driving at various speeds, the transmission started slipping and the vehicle would not properly accelerate while depressing the accelerator pedal. The vehicle was taken to the local dealer who diagnosed that the transmission clutch and seal kit was faulty and needed to be replaced. The vehicle was not repaired. The manufacturer was notified of the failure. The failure mileage was 60,000 *LN *TR

i.  NHTSA ID Number: 11424034, Date Reported: July 9, 2021, Incident Date February 1, 2021 Consumer Location JACKSONVILLE, FL Vehicle Identification Number 3FADP4BJ3KM****

The CAR has the defect that it skips the transmission changes, from the first to the second it stays accelerated, it resists the change, it is a danger it stays accelerated until it finally goes to second and lowers the revolutions. I visited an auto parts store for a scanner and that was the code: Transmission friction PO7A3x2. Here I send you some news, ford, ford defects on your focus and fiesta vehicles. http://www.fordtransmissionproblems.com/fords-transmission-problem Ford's PowerShift dual-clutch transmission was used in 2010. Class vehicles are the Ford Fiesta (model years 2011-2016) and Ford Focus (model years 2012-2016) equipped with a PowerShift transmission. The PowerShift transmission is basically a manual transmission electronically controlled by a computer while using a 'dry clutch' rather than a 'wet clutch', which means that no oil is supplied to the shift mechanism and can result in increased wear to as problems persist. When the computer

module used to operate the transmission cannot handle rapid acceleration or gear changes, the vehicle sputters and creates an audible noise. The vehicle may also experience downshifting issues, which means the vehicle will stay in a higher gear despite deceleration and jerk will result. However, this is not just a matter of convenience or comfort. When accelerating quickly through an intersection, the delay can be dangerous as it prevents the vehicle from reaching the same speed as it would with an automatic transmission. When it comes to decelerating, the inability of the car to downshift properly can cause the vehicle to roll forward, even when the brakes are applied, posing a safety hazard in many circumstances. This is all a safety hazard

j.  NHTSA ID Number: 11399639, Date Reported: March 19, 2020, Incident Date November 23, 2020 Consumer Location MINERAL, VA Vehicle Identification Number 3FADP4BJ3KM****

TL* MY 2019 FORD FIESTA AUTOMATIC DOES NOT SHIFT GEARS PROPERLY, MY CAR WOULD NOT REVERSE AND THEREFORE CAUSED A SMALL FENDER BENDER. IT HAS NO SPEED AND RUNS ROUGH

k.  NHTSA ID Number: 11210169, Date Reported: May 27, 2019, Incident Date February 3, 2019 Consumer Location UNIONTOWN, PA Vehicle Identification Number 3FADP4AJ3KM****

THE VEHICLE HAS A PROBLEM WITH THE POWERSHIFT AUTOMATIC TRANSMISSION IT'S VERY SLUGGISH WHEN SHIFTING WHEN YOU TAP THE ACCELERATOR WITH YOUR FOOT AFTER BEING AT A STOP SIGN THE CAR JOLTS LIKE PREVIOUS YEAR AND MODELS OF THIS CAR.

l.  NHTSA ID Number: 1 11398847, March 3, 2021, Incident Date April 26, 2019 Consumer Location BRASELTON, GA Vehicle Identification Number 3FADP4BJ1JM****

TL* VEHICLE DRIVING ON INTERSTATE WHEN A VIBRATION WAS FELT THROUGH THE STEERING WHEEL, THEN THE VEHICLE STARTED LOSE POWER. GEAR SHIFT STILL IN DRIVE ENGINE STILL RUNNING AND COASTED TO A STOP ON SIDE OF HIGHWAY. VEHICLE WAS REAR ENDED FOUND OUT THAT THE LEFT DRIVE AXLE HAD BECOME DISCONNECTED AT THE TRANSMISSION END. WHEN THIS HAPPENS THE SV HAS NO WAY TO MAINTAIN A SAFE SPEED

m. NHTSA ID Number: 11328346, Date Reported: June 11, 2020, Incident Date June 20, 2019 Consumer Location MOUNTAIN TOP, PA Vehicle Identification Number 3FADP4BJ8JM****

CAR SHUDDERS UPON ACCELERATION FROM STANDSTILL. LOSES POWER SEVERELY GOING UPHILL. ENGINE/TRANSMISSION SHAKES SHUDDERS ENGINE RACES AND QUICKLY ACCELERATES AFTER LOSS OF POWER THEN DECREASES AGAIN. WHEN MOVING FROM STOP CAR SHUDDERS MAKES A GRINDING NOISE AND THEN SLOWLY ACCELERATES BEFORE DECREASING RPM AND THEN RACES AGAIN

**2018 Ford Fiesta**

n. NHTSA ID Number: 11321226, Date Reported: April 15, 2020, Incident Date August 1, 2019 Consumer Location WASHINGTON, DC Vehicle Identification Number 3FADP4BJ9JM****

WHILE DRIVING THE AUTOMATIC TRANSMISSION SHUTTERS WHEN GOING INTO SECOND GEAR AND STALLS BEFORE ACCELERATING. SOME TIMES THE CAR WON'T START AND IT'S NOT RELATED TO THE BATTERY OR THE STARTER. IT ALSO HAD A PURGE VALVE REPLACEMENT THREE MONTHS AFTER PURCHASE. A FEW MONTHS LATER I HAD TO REPLACE IT AGAIN THIS TIME IT WASN'T UNDER WARRANTY. I PURCHASED THIS CAR BRAND NEW IN 2018 AND IT HAD ALL THESE ISSUES IN 2018 AND OCTOBER OF 2019 IS WHEN THE TRANSMISSION BEGAN TO SHUTTER.

o. NHTSA ID Number: 11240281, Date Reported: July 29, 2019, Incident Date June 8, 2019 Consumer Location CLAYTON, NC Vehicle Identification Number 3FADP4EJ6JM****

L* THE CAR WAS DRIVING AT 68 MPH AND APPROXIMATELY 2500 RPM STARTED TO LOOSE SPEED DOWN SLIGHT HILL AND RPMS INCREASED TO 5,500 RPM. LET OFF THE ACCELERATOR 3 SECONDS RPMS DECREASED REAPPLIED ACCELERATOR AND OPERATED PROPERLY.

p. NHTSA ID Number: 11221498, Date Reported: June 20, 2019, Incident Date June 7, 2019 Consumer Location LAS VEGAS, NV Vehicle Identification Number 3FADP4J6JM1****

L* BEEN NOTICING NOW WITH THE FORD FIESTA 2018 THAT MY THIRD GEAR. LOSES THE GRIP GOING UP HILL. BEEN LIKE THIS FOR A FEW WEEKS. I HAVE TAKEN THE CAR TO THE DEALER. TWO TIMES HAVE THEY REPAIR IT. YET, SADLY SEEMS THAT THIS WILL BE THE THIRD AND FINAL TIME. CAN'T BELIEVE.

**2017 Ford Focus**

q. NHTSA ID Number: 11456868, Date Reported: March 15, 2022, Incident Date March 15, 2022 Consumer Location PRYOR, OK Vehicle Identification Number 1fadp3h23hl****

L* The contact owns a 2017 Ford Focus. The vehicle had previously had two transmissions replaced. The contact stated that while driving at an undisclosed speed, the accelerator pedal was depressed and the engine revved, but the vehicle hesitated to accelerate. The vehicle was not diagnosed nor repaired by an independent mechanic or dealer. The manufacturer was made aware of the failure and informed the contact that there was no recall associated with the VIN. The manufacturer advised the contact to file a complaint with the NHTSA. The failure mileage was approximately 48,000.

CLASS ACTION COMPLAINT

ORD DOESN'T DO DURABLE MANUALS ANYMORE. THE ISSUES ARE A LOT ON THE HIGHWAY. CAN'T AFFORD A CRASH OR ACCIDENT.

r.  NHTSA ID Number: 11454667, Date Reported: March 1, 2022, Incident Date March 1, 2022 Consumer Location COVINGTON, LA Vehicle Identification Number 1fadp3j20hl****

The transmission in this car has burned a clutch up at 30k miles and replaced by Ford after having to twist their leg to do it. 10k miles later it was slipping again. Currently it is at 70k miles and the clutch is going out again. Ford refuses to take responsibility for this faulty transmission since it is a 2017 model and not included in the class action suit for the model just a year prior, although it is the same transmission. The slipping, stalling and jerking is a danger when pulling out into traffic and I hope it does not cause me to get in an accident and have to sue them for even more than I need to sue them for now for selling me faulty unsafe junk that doesn't last and puts my families life at risk.

q.  NHTSA ID Number: 11450358, Date Reported: February 4, 2022, Incident Date September 9, 2019 Consumer Location YUMA, AZ Vehicle Identification Number 1FADP3M2XHL****

CAR WILL SHUTTER FROM A STOP TO ACCELERATE TO SPEED. SCARY SOME TIMES THINKING YOUR GOING TO LOSE SPEED AND GET HIT. THIS HAPPENS MANY TIME, BUT BELOW YOU ONLY ALOW FOR ONE DATE OF INCIDENT, HAPPENS ALMOST EVERYDAY I DRIVE.

## 2018 Ford Focus

r.  NHTSA ID Number: 11468642, Date Reported: June 10, 2022, Incident Date October 21, 2021 Consumer Location PANAMA CITY, FL Vehicle Identification Number 1FADP3K26JL****

Transmission control module failed, and according to Ford Service tech, basically "ate" the clutch. Vehicle can not go above 30 mph, and does not shift properly. Tech states is not included in recalls, though thinks it

should be included. Parts on backorder with no ETA on resolution. No repairs able to be made. Purge Control Valve failed, causing engine to die while fuel gauge showing 3/4 tank, repeated issue until tranmission control module failure rendered vehicle mostly unusable. Tech states is not included in recalls, though thinks it should be included. Parts on backorder with no ETA on resolution. No repairs able to be made.

s.  NHTSA ID Number: 11464065, Date Reported: May 10, 2022, Incident Date March 31, 2022 Consumer Location SAN LEANDRO, CA Vehicle Identification Number 1FADP3K28JL****

The contact owns a 2018 Ford Focus. The contact stated while starting the vehicle, the vehicle was jerking. While driving approximately 30 MPH and shifting into 3rd gear, the vehicle jerked. The check engine warning light was illuminated. After restarting the vehicle, the vehicle operated as designed. The vehicle was taken to the local dealer where it was diagnosed that the clutch needed to be replaced. The vehicle was not repaired. The manufacturer was notified and referred the contact to NHTSA. The failure mileage was approximately 114,000.

t.  NHTSA ID Number: 11456923, Date Reported: March 14, 2022 Consumer Location MYAKKA CITY, FL Vehicle Identification Number 1FADP3H27JL****

Transmission started to shift and shudder harshly. Very high RPM (up to 5000-6000 rpm) without shifting. Car failed to go into reverse of "Sport" mode when shift level placed in that position. Car jerks and shudders upon initial takeoff from a stop, that feels like a sudden loss of power and has delayed acceleration. Very harsh shifting from 1st to 2nd gear that jolts entire car and driver. The RPM stays very high if the car will go into Drive and after a while the transmission overheats and a transmission temperature warning is displayed. Sometimes the car won't start. Trouble codes pulled are P087B and P287A.

u.  NHTSA ID Number: 11455787, Date Reported: May 10, 2022, Incident Date January 22, 2022 Consumer Location DERIDDER, LA Vehicle Identification Number 1FADP3H21JL****

Transmission control module went out in my car while on the highway. Car decelerated and sputtered almost causing a rear end collision. I was almost struck by a truck driving behind me.

CLASS ACTION COMPLAINT

v. NHTSA ID Number: 11451512, Date Reported: February 11, 2022, Incident Date June 1, 2019 Consumer Location CLEVELAND, TN Vehicle Identification Number 1fadp3k20jl****

The contact owns a 2018 Ford Focus. The contact stated that while stopped at a red light, the vehicle inadvertently moved forward. The vehicle was taken to the dealer and Mtn. View Ford (301 E 20th St, Chattanooga, TN 37408). The dealers had replaced the transmission on three separate occasions; however, the failure recurred. The vehicle was not repaired. The manufacturer was made aware of the failure and several cases were opened. The manufacturer declined to buy back the vehicle since it was not purchased from a Ford dealer. The failure mileage was approximately 40,000.

w. NHTSA ID Number: 11388244, Date Reported: January 14, 2020, Incident Date October 17, 2019 Consumer Location HOWELL, MI Vehicle Identification Number 1FADP3H24JL****

THE VEHICLE STUTTERS AND HESITATES WHEN TAKING OFF OR GOING AROUND CORNERS. I HAVE PANICKED SEVERAL TIMES WONDERING IF I WAS GOING TO GET HIT BY SOMEONE WHEN THE VEHICLE HESITATES AND STUTTERS. IT'S SO PRONOUNCED THAT IT FEELS LIKE THE TIRES BOUNCE. I HAVE BEEN COMPLAINING ABOUT THIS TO TWO FORD DEALERS AND ALSO FORD MOTOR COMPANY FOR A VERY LONG TIME AND HAVE TAKEN IT IN 2-3 TIMES TO LOOK AT THE TRANSMISSION AND WAS TOLD IT WAS NOT COVERED, NOR WAS THERE A RECALL. I DO KNOW THIS IS AN ONGOING ISSUE WITH THIS TRANSMISSION.

x. NHTSA ID Number: 11387876, Date Reported: January 13, 2021, Incident Date January 13, 2021 Consumer Location HARTFORD, ARVehicle Identification Number 1FADP3E20JL****

MY BOYFRIEND GOT THIS CAR APRIL 13 OF 2020 AND ABOUT A MONTH AND A HALF AFTER WE GOT IT IT STATTS ACTING UP... NOT SHOFTING OUT OF LOWER GEARS. SHUDDERING . WHEN YOU STOP AT A STOP LIGHT FOR TOO LONG AND GO TO TAKE OFF IT ALMOST STALLS. WE ALMOST GOT HIT BECAUSE OF IT! IT SOUNDS LILE GEARS ARE GRINDING OR LIKE WE ARE DRAGGING SOMETHING UNDER THE CAR. WE HAVE TAKEN IT IN TWOCE TO GET CHECKED AND THE FORST GUY THAT

CLASS ACTION COMPLAINT

SROVE IT AROUND THE LOT SAIS SOMETHING WAS WRONG WOTH IT NUT AFTWR THEY HAD IT ON THE SHOP FOR ABOUT AN HOUR ANS A HALF THEY BRING IT BACK TO US THE SECOND TIME AND SAY NOTHING OS WRONG WOTH IT.... IT IS GETTING WORSE AND WORSE. IS STATTED OUT JUST NOT WAMTING TO SHIFT FROM SECOND GEAR NOW IT DOESNT EVEN WANNA SHIFT OUT OF FIRST MOST THE TIME. 45000 MILES. THERE SHOULD BE NO ISSUES WOTH THIS CAR.

   y. NHTSA ID Number: 11378604, Date Reported: December 9, 2020, Incident Date September 6, 2019 Consumer Location TUCSON, AZ Vehicle Identification Number 1FADP3F21JL****

I GOT THE VEHICLE ON 4/30/2019, ONE MONTH LATER, THE VEHICLE BEGAN WITH ISSUES. AFTER YOU COME TO A FULL STOP AND THEN YOU LET YOU FOOT OFF THE BRAKE AND PRESS THE ACCELERATOR TO GO FORWARD, THE CAR SHAKES / VIBRATES. I HAVE ALREADY TAKEN MY VEHICLE 3 TIMES TO THE DEALERSHIP ABOUT THE SAME ISSUE, THE ISSUE DOES GET FIX BUT AFTER A MONTH, THE SAME ISSUE BEGINS AGAIN. THE DEALERSHIP TOLD ME THAT THIS PROBLEM WILL HAPPEN EVERY MONTH, I WAS NEVER TOLD ABOUT IT BEFORE I BOUGHT/FINANCE THE VEHICLE. ALSO MY VEHICLE IS NOT GETTING THE PROPER FULL MILEAGE IT SHOULD BE GETTING

   z. NHTSA ID Number: 11378480, Date Reported: January 13, 2021, Incident Date April 19, 2019 Consumer Location HOPEWELL, VA Vehicle Identification Number 1FADP3E28JL****

VEHICLE IS SLOW ACCELERATING ON THE HIGHWAY GETTING ON AND OFF RAMPS. IT JERKS AND LAGS WHEN PROCEEDING AFTER A STOP. THIS HAS BEEN AN ON GOING PROBLEM SINCE PURCHASE. SERVICED MULTIPLE TIMES. PROBLEM ADDRESSED FOR ABOUT A WEEK AND THE JERKING ALWAYS RETURNS.

**Consumer Complaints on Third-Party Websites**

98.    Consumers similarly complained about the Defect in Class Vehicles on various online forums. Consumers have also posted extensively on websites dedicated to discussions of Ford's vehicles regarding the Transmission Defect in vehicles equipped with the PowerShift Transmissions. Ford has made the monitoring of consumer complaints as posted on third-party websites a part of their corporate strategy for brand management since at least 2012.[11]

99.    The following complaints are a sampling of the many on third-party consumer websites, which Ford would have seen as part of its online brand management:

**DPS6 Transmission-Equipped Ford Focuses**

a.    *Scooter 6 December 6, 2019:* My aunt's Focus with 50,000 miles started having issues. It was jerky and hesitant to shift. It started to have issues running and starting up to the point it wouldn't drive on some occasions. I always thought it was junk.

b.    *RyanLee036 Aug 2, 2019*: You don't have to own a DCT-equipped vehicle to notice issues. I test-drove a 2014 that has the shudder. I rode in a colleagues' DCT Focus that has the shudder. And to top it all off, the Detroit Free Press article pretty much confirms what most of us were thinking.[12]

c.    *James B. January 14, 2021:* The 2017 Ford Focus transmission problems are jerks or hard shifts. The transmission fluid needs to be replaced every 30,000 to 60,000 miles. Along with fluid changes, terrible sounds will come from the transmission. Old transmission fluid

---

[11] Read, Richard, "Taking your car complaint online? Chrysler, GM, and Ford will see it.", *Christian Science Monitor*, Aug. 21, 2012 (available at https://www.csmonitor.com/Business/In-Gear/2012/0827/Taking-your-car-complaint-online-Chrysler-GM-and-Ford-will-see-it. (last visited June 17, 2022)

[12] https://www.focusfanatics.com/threads/all-things-dct-what-it-is-why-its-still-broken-in-2018-models-and-ways-to-fix-it.808117/page-3 (last visited June 14, 2022).

will be awful to the ear. A worn out torque converter will cause a headache. The transmission is one of the most crucial parts of the vehicle. You will come into issues at some point. The gears can become stuck. There could be jerking. Hard shifts may arise and that is no good. You might experience shudders. Delayed shifts will cause acceleration problems. The transmission could slip. If the transmission fluid leaks, that needs to be patched quickly.[13]

d. _Melitta Bryant_ May 4, 2021: My transmission went out on my 2017 Ford Focus.[14]

e. _E.L._ October 7, 2021: Our 2017 Focus needs its 5th clutch pack at 60,000 miles...Ford has refused to pay for the repair under warranty. Do not buy any Focus or Fiesta with the "automatic" DPS6 transmission in it they are junk and you will have problems with it for the life of the vehicle. The first problem started acting up at 18,000, 2nd at 27,000, 3rd at 43,000, 4th at 56,000...now needs 5th clutch pack which Ford says is out of warranty, they deny any responsibility for their faulty design which THEIR ENGINEERS told them about.[15]

f. _L.C._ April 30, 2021: I had to have major transmission work done on my 2017 Focus at 24,000 miles and the same work again at 28,000 miles. The dealership is more that 20 miles away and they didn't have a loaner vehicle for me while my car was being repaired.[16]

---

[13] https://www.vehiclehistory.com/questions/does-the-2017-ford-focus-have-transmission-problems-9904 (last visited (June 14, 2022).

[14] _Id._

[15] _Id._

[16] _Id._

**DPS6 Transmission-Equipped Ford Fiestas**

     g. *BarnTart* 3 mo. ago edited 3 mo. ago: I've driven a dct Fiesta, damn thing shudders, like the gears are binding, or stumbling[17]

     h. *Prophage7* 3 mo. ago: [F]ord's DCT on the other hand... nothing you can do about it and when it is "working" you still get neck-jerking slams into gear randomly.[18]

     i. *Testthrowawayzz* 3 mo. ago: Ford PowerShift is the worse. I never had a Nissan CVT fail on me on the freeway whereas Ford PowerShift did[19]

     j. *Kimi* 1 year ago: Loss or reverse and shudder early in acceleration.[20]

     k. *Gary Matlock* 1 year ago: Makes a noise-like gears turning-when u turn key on-no reverse but has gotward.[21]

     l. *Patricia Johnson* 19 days ago: My car is making a loud noise rattling acts like it don't want to drive forward the mechanic said that there's something loose in the transmission I have to take care of my elderly mom she's a cancer survivor can't get her back and forth to the doctor I can't go to my physical therapy and every Ford dealership in my area are booked and can't get to it until December or January what am I supposed to do only had the car a year on a set income.[22]

    100.   Ford had superior and exclusive knowledge of the Transmission Defect and knew or should have known that the defect was not known or reasonably

---

[17] https://www.reddit.com/r/cars/comments/tsn53v/ford_powershift_dct_vs_nissanjatco_cvt_which/ (last visited June 14, 2022)

[18] *Id.*

[19] *Id.*

[20] https://www.transmissionrepaircostguide.com/ford-fiesta-transmission-problems/comment-page-2/#comments (last visited June 14, 2022).

[21] *Id.*

[22] *Id.*

1   discoverable by Plaintiffs and Class Members before they purchased or leased the

2   Class Vehicles.

3       101.   Before Plaintiffs purchased their Class Vehicles, and since 2010, Ford

4   knew about the Transmission Defect through sources not available to consumers,

5   including pre-release testing data, early consumer complaints to Ford and its

6   dealers, testing conducted in response to those complaints, high failure rates and

7   replacement part sales data, and other aggregate data from Ford dealers about the

8   problem.

9       102.   Ford is experienced in the design and manufacture of consumer

10  vehicles. As an experienced manufacturer, Ford conducts tests, including pre-sale

11  durability testing, on incoming components, including the engines, to verify the

12  parts are free from defect and align with Ford's specifications.[23] Thus, Ford knew

13  or should have known that the subject transmission was defective and prone to put

14  drivers in a dangerous position due to the inherent risk of the defect. In particular,

15  thermal testing of pre-production models revealed the Transmission Defect.

16      103.   Additionally, Ford should have learned of this widespread defect from

17  the many reports received from dealerships and from customer complaints directly

18  to Ford. Ford's customer relations department collects and analyzes field data

19  including, but not limited to, repair requests made at dealerships, technical reports

20  prepared by engineers who have reviewed vehicles for which warranty coverage is

21  being requested, parts sales reports, and warranty claims data.

22      104.   Defendant's warranty department similarly analyzes and collects data

23  submitted by its dealerships in order to identify trends in its vehicles. It is

24  Defendant's policy that when a repair is made under warranty the dealership must

25

26  ---

    [23]   Akweli Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM,
27  http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-
    testing.htm ("The idea behind car testing is that it allows manufactures to work out
28  all the kinks and potential problems of a model before it goes into full production.")
    (last visited June 6, 2022).

provide Ford with detailed documentation of the problem and the fix employed to correct it. Dealerships have an incentive to provide detailed information to Ford, because they will not be reimbursed for any repairs unless the justification is sufficiently detailed.

105. Ford service centers, independent repair shops, and consumers doing repairs themselves use Ford replacement parts that they order directly from Ford. Thus, Ford would have detailed and accurate data regarding the number and frequency of replacement part orders, information which is also exclusively within Ford's control and unavailable to Plaintiffs without discovery. The ongoing high sales of replacement transmissions and transmission components such as clutches and seals, was certainly known to Ford, and should have alerted Ford that its PowerShift Transmissions were suffering from a defect, causing shuddering, surging, slipping, failure, delayed acceleration, and stalling.

106. The existence of the Transmission Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class Members known of the Transmission Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

107. Irrespective of all the aggregate information, both internal and external, that clearly provided Ford with knowledge that the PowerShift Transmission is dangerously defective, Ford has never disclosed to owners or prospective purchasers that there is a safety defect in the Class Vehicles. In fact, Ford intentionally and actively concealed the existence of a safety defect in the Class Vehicles.

108. Reasonable consumers, like Plaintiffs, reasonably expect that a vehicle's transmission is safe, will function in a manner that will not pose a safety hazard, and is free from defects. Plaintiffs and Class Members further reasonably expect that Ford will not sell or lease vehicles with known safety defects, such as

the Transmission Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Ford to fail to disclose the Transmission Defect to them and to continually deny the defect existed.

### Technical Service Bulletins and Other Ford Communications

109.   Beginning in 2010, Ford began issuing multiple TSBs to address the defects in their PowerShift Transmissions. However, Ford never communicated the TSBs, or the information they contained, directly to the Class or any prospective buyers. Instead, Ford prepared a separate series of sanitized documents for its customers intended to induce them into believing that their kicking, bucking, shuddering vehicles were exhibiting "normal driving characteristics."

110.   Indeed, when owners of Ford Vehicles equipped with PowerShift Transmissions exhibiting the Transmission Defect bring their vehicles to Ford dealerships, the dealerships have often provided them with a document entitled "PowerShift 6-Speed Transmission Operating Characteristics." Ford drafted this document and provided it to its dealers to give to customers whose vehicles were exhibiting the Transmission Defect, in an apparent attempt to induce customers into believing the problems they were experiencing were "normal driving characteristics."

111.   Rather than disclosing that the PowerShift transmission was defective, this document states that customers may experience "a trailer hitching feel (or a slight bumping fee)" calling this "a normal characteristic of the dry clutch-equipped manual transmission design." Ford did not disclose in this letter that the PowerShift transmission was defective, and did not disclose the PowerShift transmission exhibits transmission slips, bucking, kicking, jerking, premature internal wear, sudden acceleration, delay in downshifts, delayed acceleration, difficulty stopping the vehicle, or transmission failure.

112.   Beginning in 2010, Ford issued several Technical Service Bulletins ("TSBs") to its dealers in the United States acknowledging defects in the PowerShift

Transmission— the same or substantially similar Transmission as that equipped in the Class Vehicles. Ford's TSB from September 2010, covering the 2011 Ford Fiesta, informs dealers of "concerns such as no engagement or intermittent no engagement in Drive or Reverse when shifting from Park to Drive or Reverse, grinding noise during engagement, and/or a check engine light with transmission control module (TCM) diagnostic trouble code ... "

113.   Ford's TSB No. AS-21687 released on January 1, 2011, covering the 2011 Fiesta with the PowerShift Transmission, informs dealers of problems with the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving."

114.   Ford's TSB No. AS-21769 from March 31, 2011, also covering the 2011 Ford Fiesta, informs dealers of problems where the PowerShift Transmission "exhibit[s] a rattle/grind noise in reverse only."

115.   Another Ford TSB, No. 11-5-13, released on May 17, 2011 (and later superseded by TSB 11-9-2 updating repair procedure) advised dealers to reprogram the transmission computer if 2011 Fiesta owners complained about "hesitation when accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-speed tip-in or tip-out maneuvers and/or engine r.p.m. flare when coasting to a stop."

116.   The 2012 Focus was the subject of a Ford TSB issued in September 2011, which informed dealers of transmission problems including: "RPM flare on deceleration coming to a stop, rough idle on deceleration coming to a stop, intermittent engine idle fluctuations at a stop, intermittent vehicle speed control inoperative, intermittent harsh engagement/shift…."

117.   In March 2014, Ford released TSB No. 14-0047, which applied to the 2011-2014 Fiesta and the 2012-2014 Focus and superseded earlier TSBs. This bulletin stated: "[v]ehicles equipped with a DPS6 automatic transmission may exhibit an intermittent transmission clutch shudder on light acceleration from a stop.

1    Some vehicles may or may not exhibit transmission fluid leaking from the clutch

2    housing." The bulletin further directed technicians on an updated repair protocol.

3        118.   Also, in 2014, Ford issued an extended warranty on the TCM in certain

4    2012 Fiestas and Focuses with the PowerShift Transmission, extending coverage to

5    10 years or 150,000 miles. This was due to electrical circuit failures in the TCM.

6        119.   The 2013-2016 Focus and Fiesta, equipped with the substantially

7    similar PowerShift Transmission equipped in the Class Vehicles, were addressed in

8    subsequent TSBs that re-issued and superseded the earlier TSBs described above.

9    For example, TSB No. 16-0129 was issued September 26, 2016, and addressed

10   "intermittent concerns of loss of transmission engagement while driving,

11   intermittent no start or a loss of power." Customers indicating that they were

12   experiencing the above transmission problems were to have their vehicles

13   diagnosed and repaired. This bulletin directed dealers on how to properly perform

14   reprogramming to the TCM and clutch adaptive learning (the indicated repair for

15   the above symptoms.)

16       120.   The 2013-2016 Focus and 2013-2015 Fiesta were again addressed in

17   TSB No. 16-0109, issued on August 16, 2016, and warning Ford dealers of

18   "excessive transmission clutch shudder on light acceleration." This bulletin directed

19   dealers on the proper service procedures and part lists for repairing the above

20   problems. The recommended repairs include clutch or seal replacement, depending,

21   with the same parts previously complained of.

22       121.   On July 12, 2019, Ford released "Short-Term DPS6 Dealer Customer

23   Handling Directions" for Ford Fiestas and Focuses, including model years 2017.

24   Unlike typical TSBs, this bulletin was directly to all dealership departments,

25   including new and used sales, fleet sales, finance, parts, and service. Customers

26   indicating that they were experiencing transmission problems were to have their

27   vehicles diagnosed and repaired. Customers who called asking questions about the

28   PowerShift transmission were to be directed to contact Ford's Customer

Relationship Center. For diagnosing the issues with the transmission, dealerships were directed to look at previously issued TSBs and customer satisfaction programs, including 14M01, and 14M02, and 15B22. The bulletin promised an update on July 19, 2019.

122.   Additionally, in July 2020, "Certain 2016 through 2017 Model Year Focus equipped with a DPS6 Automatic Transmission" were addressed in "Customer Satisfaction Program 20B23" issued to Ford dealers, which warned of customer reports of "erratic shifting, missed gear shifting, vibration, and check engine light illumination."

123.   On May 21, 2021, Ford alerted its authorized dealerships as to shift quality concerns, including skip shift events, as a result of incorrect input speed sensor A shim thickness. When consumers with 2015 to 2018 Ford Focus vehicles with the DPS6 transmission complained about shift quality, dealerships were directed to "check and verify that the [iput speed sensor A] shim is 2.0 mm," before proceeding for further diagnostics.

### Ford Has Actively Concealed the Transmission Defect

124.   Despite its knowledge of the Transmission Defect in the Class Vehicles, Ford actively concealed the existence and nature of the defect from Plaintiffs and Class Members. Specifically, Ford failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

   a. any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the PowerShift Transmission;

   b. that the Class Vehicles, including their Transmissions, were not in good working order, were defective, and were not fit for their intended purposes; and

   c. that the Class Vehicles and their Transmissions were defective, despite the fact that Ford learned of such defects as early as 2010.

125.   As discussed above, Ford monitors its customers' discussions on online forums, and actively concealed the defect by denying the existence of a defect, claiming shuddering and jerking and failed acceleration are normal conditions, and blaming the class members for the problems.

126.   A mailing sent to customers in August 2014 for previous models which included the PowerShift Transmission extended the limited warranty on the clutch and transmission input shaft seals and transmission software calibration to seven years or 100,000 miles. The mailing stated that only customers experiencing "excessive transmission clutch shudder on light acceleration" should take their vehicles to a dealership for repair. However, an insert also described the following as "Normal Operating Characteristics:" "mechanical noises after the engine is turned off, after the driver door is opened and during some transmission shifting events," "firm gearshifts when moving the accelerator pedal back and forth quickly," and "slight vibrations [] when accelerating the vehicle from low speeds." Discovery will show that these statements were also given to Class Members who inquired about shifting issues or vibrations experienced in their Class Vehicles.

127.   When consumers present their Class Vehicles to an authorized Ford dealer for diagnosis and repair, Ford refuses to honor the warranty, telling the customers that the condition is normal or else providing ineffective and incomplete repairs.

128.   Ford even told its own employees that effects of the Transmission Defect, including shuddering and slipping, were normal. As described by one production worker in the Michigan Assembly Plant, "As soon as you'd drive those cars off the line, you'd feel the shuddering…We were always told that's normal. The slipping is normal."

129.   Despite telling Plaintiffs and Class Members that the PowerShift Transmission was working normally, Ford went after the transmission's designer, Getrag, demanding that the supplier reimburse Ford for the transmission's failures.

1   Ultimately, Getrag paid Ford at least $50 million to release the supplier from claims
2   related to the PowerShift Transmission.[24]

3       130.   Accordingly, despite Ford's knowledge of the Transmission Defect,
4   Ford has caused Class Members to expend money at its dealerships to diagnose,
5   repair, or replace the Class Vehicles' Transmissions and components, once the time
6   limitations have run on the bumper-to-bumper warranty.

7   **Ford Unjustly Retained Substantial Benefits**

8       131.   Ford unlawfully failed to disclose the alleged Transmission Defect to
9   induce them and other putative Class Members to purchase or lease the Class
10  Vehicles.

11      132.   Plaintiffs further allege that Ford thus engaged in deceptive acts or
12  practices pertaining to all transactions involving the Class Vehicles.

13      133.   As discussed above therefore, Plaintiffs allege that Ford unlawfully
14  induced them to purchase their respective Class Vehicles by concealing and/or
15  omitting a material fact (the Transmission Defect) and that Plaintiffs would have
16  paid less for the Class Vehicles, or not purchased them at all, had they known of the
17  Transmission Defect.

18      134.   Accordingly, Ford's ill-gotten gains—benefits accrued in the form of
19  increased sales and profits resulting from the material concealment and omissions
20  that did and will likely continue to deceive consumers—should be disgorged.

21
22
23
24
25
26

---

27  [24] *See* Ford knew Focus, Fiesta models had flawed transmission, sold them anyway, DETROIT FREE PRESS (July 11, 2019), https://www.freep.com/in-depth/money/cars/ford/2019/07/11/ford-focus-fiesta-transmission-defect/1671198001/ (last visited June 13, 2022).

**The Agency Relationship Between Ford and its Network of Authorized Dealerships**

135.   Defendant enters into agreements with its nationwide network of authorized dealerships to fulfill Defendant's obligations under the warranties it provides directly to consumers as well as to provide repairs under recalls. These agreements require a dealership to follow the rules and policies of Ford in all aspects of diagnosing, repairing, maintaining, and servicing Ford vehicles, as well as selling only Ford-approved parts for the vehicles, for reimbursement by Ford.

136.   Because Plaintiffs and members of the Class are third-party beneficiaries of the manufacturer-dealership agreements which create the implied warranty, they may avail themselves of the implied warranty and allow consumers to seek warranty and recall services locally. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

137.   Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of Defendant's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Defendant. Defendant's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of Defendant's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

138.   Defendant issued the express warranties to the Plaintiffs and the Class members. Defendant also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Defendant also is responsible for the content of the Moroney Stickers on Defendant-branded vehicles.

139. In repairing Ford-branded vehicles, Defendant acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Defendant representatives and agents. That the dealers act as Defendant's agents is demonstrated by the following facts:

a. The authorized Ford dealerships complete all service and repair according to Defendant's instructions, which Defendant issues to its authorized dealerships through service manuals, technical service bulletins ("TSBs"), and other documents, often only accessible via Defendant's proprietary systems and tools, including the Ford diagnostic scan tool referenced on many TSBs such as the Ford Integrated Diagnostic System and Ford J2534 Diagnostic Software;

b. Consumers are able to receive services under Defendant's issued New Vehicle Limited Warranty only at Defendant's authorized dealerships, and they are able to receive these services because of the agreements between Defendant and the authorized dealers. These agreements provide Defendant with a significant amount of control over the actions of the authorized dealerships;

c. The warranties provided by Defendant for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

d. Defendant controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Defendant's authorization;

e. Defendant has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public;

f. Defendant implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Defendant dealerships to address complaints of the Transmission Defect by prescribing and implementing the relevant TSBs cited herein; and

g. Ford's authorized dealerships are able to bind Ford into the terms of the express warranties by selling vehicles to the public, by reviewing the quality of used Ford vehicles and certifying their worthiness to receive Ford's Certified Pre-Owned Warranties.

140. Indeed, Ford's warranty booklets make it abundantly clear that Ford's authorized dealerships are Ford's agents so that consumers may receive repairs from Ford under the warranties it provides directly to consumers such as Plaintiffs. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its "your selling dealer." For example, the booklets state, that "[w]hen you need warranty repairs, your selling dealer would like you to return to it for that service, but you may also take your vehicle to another Ford Motor Company dealership authorized for warranty repairs." The booklets further state that "[y]our Ford or Lincoln dealership, or Ford or Lincoln Auto Care Service Center, has factory-trained technicians who can perform the required maintenance using genuine Ford parts."

141. The booklets further state that "[d]uring the Bumper to Bumper Warranty period, dealers may receive instructions to provide no-cost, service-type improvements – not originally included in your Owner's Manual – intended to increase your overall satisfaction with your vehicle." As such, authorized dealerships are not only Ford's agents to perform Ford's promised services under the warranties provided by Ford directly to the consumer, and are Ford's agents to provide "improvements" to Plaintiffs' and Class members' vehicles at Ford's direction.

## **TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL**

142.   Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Transmission Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendant's deception with respect to the Defect. Defendant and its agents continue to deny the existence and extent of the Defect, even when questioned by Plaintiffs and members of the Class.

143.   Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that the Defendant was concealing a defect and/or the Class Vehicles contained the Transmission Defect and the corresponding safety risk. As alleged herein, the existence of the Transmission Defect was material to Plaintiffs and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendant was concealing the Defect.

144.   At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality, and grade of the Class Vehicles and to disclose the Transmission Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Transmission Defect in Class Vehicles.

145.   Defendant knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiffs and members of the Class reasonably relied on Defendant's knowing, active, and affirmative concealment.

146.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

1

## **CLASS ACTION ALLEGATIONS**

2      147.  Plaintiffs bring this lawsuit as a class action on behalf of themselves

3  and all others similarly situated as members of the proposed Class pursuant to

4  Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the

5  numerosity, commonality, typicality, adequacy, predominance, and superiority

6  requirements of those provisions.

7      148.  The Classes are defined as:

8        **Nationwide Class:** All persons and entities in the United

9  States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").

10        **Tennessee Sub-Class:** All individuals who purchased or

11  leased any Class Vehicle in the State of Tennessee.

12        **Florida Sub-Class:** All individuals who purchased or leased any Class Vehicle in the State of Florida.

13        **Texas Sub-Class:** All individuals who purchased or

14  leased any Class Vehicle in the State of Texas.

15        **Nebraska Sub-Class:** All individuals who purchased or leased any Class Vehicle in the State of Nebraska.

16

17      149.  Excluded from the Class are: (1) Defendant, any entity or division in

18  which Defendant has a controlling interest, and their legal representatives, officers,

19  directors, assigns, and successors; (2) the Judge to whom this case is assigned and

20  the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court

21  system who may hear an appeal of any judgment entered; and (4) those persons who

22  have suffered personal injuries as a result of the facts alleged herein. Plaintiffs

23  reserves the right to amend the Class definitions if discovery and further

24  investigation reveal that the Class should be expanded or otherwise modified.

25      150.  Numerosity: Although the exact number of Class Members is uncertain

26  and can only be ascertained through appropriate discovery, the number is great

27  enough such that joinder is impracticable. The disposition of the claims of these

28  Class Members in a single action will provide substantial benefits to all parties and

to the Court. The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

151. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Ford. The representative Plaintiffs, like all Class Members, have been damaged by Defendant's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective Transmission and/or other damaged components of the Transmission. Further, the factual bases of Ford's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

152. <u>Commonality</u>: There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

a. Whether Class Vehicles suffer from defects relating to the Transmission;

b. Whether the defects relating to the Transmission constitute an unreasonable safety risk;

c. Whether Defendant knows about the defects pertaining to the Transmission and, if so, how long Defendant has known of the defect;

d. Whether the defective nature of the Transmission constitutes a material fact;

e. Whether Defendant has a duty to disclose the defective nature of the Transmission to Plaintiffs and Class Members;

f. Whether Plaintiffs and the other Class Members are entitled to equitable relief, including a preliminary and/or permanent injunction;

g. Whether Defendant knew or reasonably should have known of the defects pertaining to the Transmission before it sold and leased Class Vehicles to Class Members;

h. Whether Defendant should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective Transmission;

i. Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective Transmission;

j. Whether Defendant breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act; and

k. Whether Defendant breached written warranties pursuant to the Magnuson-Moss Warranty Act.

153. <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and they intend to prosecute this action vigorously.

154. <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy or relief. Class treatment of

common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

## FIRST CAUSE OF ACTION
### (Breach of Express Warranty)
### (On Behalf of the Class and the Sub-Classes)

155.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

156.   Plaintiffs bring this claim individually and on behalf of the members of the Class and Sub-Classes.

157.   Ford is a "merchant" as defined under the Uniform Commercial Code (UCC).

158.   The Class Vehicles are "goods" as defined under the UCC.

159.   Ford provided a New Vehicle Limited Warranty ("NVLW") that expressly warranted Ford would repair any defects in materials or workmanship free of charge during the applicable warranty periods.

160.   Plaintiffs and Class Members experienced the Transmission Defect within the warranty period.

161.   Ford breached its warranty by failing to provide an adequate repair when Plaintiffs and the Class Members presented their Class Vehicles to authorized Ford dealers for repair of the Transmission Defect.

162.   The warranty formed the basis of the bargain that was reached when Plaintiffs and Class Members purchased or leased their Class Vehicles.

163.   As a result of Ford's breach of its express warranty, Plaintiffs and Class Members have suffered economic damages including, but not limited to, the loss of the benefit of their bargain, loss of vehicle use, diminished value, substantial loss in value and resale value, out-of-pocket expenses for maintenance and service that they otherwise would not have incurred but for the Transmission Defect.

164.   Plaintiffs and members of the Class have had sufficient direct dealings with either Ford or its agents (*i.e.*, dealerships and technical support) to establish privity of contract between Ford, on one hand, and Plaintiffs and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Ford and its distributors and dealers, and specifically, of Ford's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

165.   Any attempt by Defendant to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because Defendant knowingly sold or leased defective products without informing consumers about the Transmission Defect. The time limits are unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and members of the Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Defendant and unreasonably favored Defendant. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Transmission Defect existed between Defendant and members of the Class.

166.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the members of the Class whole, because on information and belief, Defendant has failed and/or has refused to adequately provide the promised remedies, *i.e.,* a permanent repair, within a reasonable time.

CLASS ACTION COMPLAINT

167.   Plaintiffs and Class Members were not required to notify Ford of the breach or were not required to do so because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Transmission Defect from its own pre-production testing, from the early complaints, service requests, and replacement part orders it received from its network of dealerships and Class Members, from repairs and/or replacements of the Transmission and other related system components under warranty, and from other internal sources, including communications and complaints from its network of dealerships.

168.   Plaintiffs and Class Members provided Ford with notice of the issues complained of herein within a reasonable time by presenting their Class Vehicles to authorized Ford dealers for repair of the Transmission Defect. Ford also received notice of the issues complained of herein by numerous complaints made directly to Ford and online, and from internal sources.  Ford also received notice of the express warranty claims of Plaintiffs and the Class on DATE.

169.   Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the Transmissions.

170.   Plaintiffs and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of such obligations as a result of Ford's conduct described herein.

171.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Ford to limit its express warranty in a manner that would exclude or limit coverage for the Transmission Defect, including benefit-of-the-bargain, incidental, or consequential damages, would cause the warranty to fail of its essential purpose. Plaintiffs and Class Members have presented their Class Vehicles to Ford's authorized dealers on numerous occasions and Ford has failed to remedy the Transmission Defect. As a result, Plaintiffs and Class Members are left

with defective vehicles that pose a safety hazard and do not function as intended and, therefore, have been deprived of the benefit of their bargains.

172.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Ford to limit its express warranty in a manner that would exclude or limit coverage for the Transmission Defect would be unconscionable. Ford's warranties were adhesive and did not permit negotiations. Ford possessed superior knowledge of the Transmission Defect, which is a latent defect, prior to offering Class Vehicles for sale. Ford concealed and did not disclose the Transmission Defect, and Ford did not remedy the Transmission Defect prior to sale or lease (or afterward).

## SECOND CAUSE OF ACTION
### (Breach of Written Warranty under the Magnuson-Moss Warranty Act)
### (15 U.S.C. § 2303 *et seq.*)
### (On Behalf of the Class and the Sub-Classes)

173.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

174.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Class and the Sub-Classes against Defendant.

175.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain. Accordingly, Defendant's express warranty is an express warranty under state law.

176.   The Transmission and its component parts were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

177.   In a section entitled "What is Covered," Defendant's express warranty provides, in relevant part, that "authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction

or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."

178.   According to Ford, the "bumper to bumper" NVLW "lasts for three years - unless you drive more than 36,000 miles before three years elapse. In that case, your coverage ends at 36,000 miles."

179.   Defendant breached the express warranties by selling and leasing Class Vehicles with the Transmission Defect, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the Transmission and its component parts, and instead, replacing the defective Transmission and its components with equally defective Transmissions and components. By simply replacing Plaintiffs' and Class Members' defective Transmissions and components with similarly defective parts, Ford has failed to "repair" the defects as alleged herein.

180.   Plaintiffs and the Class were not required to notify Ford of the breach or were excused from doing so because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile.

181.   Plaintiffs and the Class provided Ford with notice of the issues complained of herein within a reasonable time by presenting their Class Vehicles to authorized Ford dealers for repair of the Transmission Defect. Ford also had notice of the issues complained of herein by numerous complaints made directly to Ford and online, and from internal sources. Ford also received notice of the warranty claims of Plaintiffs and the Class on April 27, 2022.

182.   Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the Transmission system.

183.   As a direct and proximate cause of Defendant's breach, Plaintiffs and the other Class Members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiffs and the other

1  Class Members have incurred or will incur economic damages at the point of repair
2  in the form of the cost of repair.

3      184.   Plaintiffs and the other Class Members are entitled to legal and
4  equitable relief against Defendant, including actual damages, consequential
5  damages, specific performance, attorneys' fees, costs of suit, and other relief as
6  appropriate.

**THIRD CAUSE OF ACTION**
**(Breach of Implied Warranty of Merchantability)**
**(On Behalf of the Class and Sub-Classes)**

10     185.   Plaintiffs incorporate by reference the allegations contained in the
11  preceding paragraphs of this Complaint.

12     186.   Plaintiffs bring this cause of action on behalf of themselves and the
13  members of the Class and the Sub-Classes.

14     187.   Ford is a "merchant" as defined under the UCC.

15     188.   The Class Vehicles are "goods" as defined under the UCC.

16     189.   A warranty that the Class Vehicles were in merchantable quality and
17  condition arises by operation of law with respect to transactions for the purchase
18  and lease of Class Vehicles. Defendant provided Plaintiffs and Class Members with
19  an implied warranty that the Class Vehicles and their components and parts are
20  merchantable and fit for the ordinary purposes for which they were sold.

21     190.   However, the Class Vehicles are not fit for their ordinary purpose of
22  providing reasonably reliable and safe transportation because, *inter alia*, the Class
23  Vehicles suffered from the inherent Transmission Defect at the time of sale and
24  thereafter.

25     191.   Defendant's actions, as complained of herein, breached the implied
26  warranty that the Class Vehicles were of merchantable quality and fit for such use.

27     192.   Privity is not required here because Plaintiffs and members of the
28  Class are intended third-party beneficiaries of contracts between GM and its

distributors and dealers, and specifically, of Ford's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

193. Plaintiffs and the Class were not required to notify Ford of the breach or were excused from doing so because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile.

194. Ford also had notice of the issues complained of herein by the presentation of Plaintiffs' Class Vehicles to authorized Ford dealers for repair of the Transmission Defect, numerous complaints made directly to Ford and online, and from internal sources. Ford also received notice of the implied warranty claims of Plaintiffs and the Class on April 27, 2022.

195. Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the Transmission system.

196. Because Plaintiffs purchased their vehicles from authorized Ford dealers, Plaintiffs are in privity with Ford since an agency relationship establishes privity for purposes of the breach of implied warranty claims. In addition, privity is not required because Plaintiffs are intended third-party beneficiaries of Defendant's implied warranties.

197. As a result of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.

**FOURTH CAUSE OF ACTION**
**(Breach of Implied Warranty under the Magnuson-Moss Warranty Act)**
**(15 U.S.C. § 2303 *et seq.*)**
**(On Behalf of the Class and the Sub-Classes)**

198. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

199. Plaintiffs bring this cause of action on behalf of themselves and the Class and the Sub-Classes against Defendant.

200. The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

201. Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

202. Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

203. Ford impliedly warranted that the Class Vehicles were of merchantable quality and fit for use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their Transmissions that were manufactured, supplied, distributed, and/or sold by Ford would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their Transmissions would be fit for their intended use while the Class Vehicles were being operated.

204. Contrary to the applicable implied warranties, the Class Vehicles and their Transmission at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles – their Transmissions – are defective. Accordingly, the Class Vehicles are not fit for their intended use.

205. Defendant's breach of implied warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

206. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets

or exceeds the sum or value of $50,000.00 (exclusive of interests and costs) computed based on all claims to be determined in this suit.

207. Plaintiffs and the Class were not required to notify Ford of the breach or were excused from doing so because affording Ford a reasonable opportunity to cure its breach have been futile.

208. Ford also had notice of the issues complained of herein by the presentation of Plaintiffs' Class Vehicles to authorized Ford dealers for repair of the Transmission Defect, numerous complaints made directly to Ford and online, and from internal sources. Ford also received notice of the implied warranty claims of Plaintiffs and the Class on April 27, 2022.

209. Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the Transmission.

210. As a direct and proximate cause of Defendant's breach of implied warranties, Plaintiffs and Class Members sustained and incurred damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

211. As a result of Defendant's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class Members have incurred damages.

1
2
3

**FIFTH CAUSE OF ACTION**
**(Breach of Express Warranty)**
**(TENN. CODE §§ 47-2-313 AND 47-2A-210 )**
**(On behalf of the Tennessee Sub-Class)**

4   212.   Plaintiffs incorporate by reference the allegations contained in the
5   preceding paragraphs of this Complaint.

6   213.   Plaintiff Margaret Barnes ("Tennessee Plaintiff") brings this count on
7   behalf of herself and the Tennessee Sub-Class against Defendant.

8   214.   Ford is and was at all relevant times a "merchant" with respect to motor
9   vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "seller" of
10  motor vehicles under § 47-2-103(1)(d).

11  215.   With respect to leases, Ford is and was at all relevant times a "lessor"
12  of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

13  216.   The Class Vehicles are and were at all relevant times "goods" within
14  the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

15  217.   The Powershift Transmissions were manufactured and/or installed in
16  the Class Vehicles by Defendant and are covered by the express warranty.

17  218.   Ford provided all purchasers and lessees of the Class Vehicles with an
18  express warranty described herein, which became a material part of the bargain.
19  Accordingly, Ford's express warranty is an express warranty under Tennessee state
20  law.

21  219.   In a section entitled "What is Covered," Defendant's express warranty
22  provides, in relevant part, that "authorized Ford Motor Company dealers will,
23  without charge, repair, replace, or adjust all parts on your vehicle that malfunction
24  or fail during normal use during the applicable coverage period due to a
25  manufacturing defect in factory-supplied materials or factory workmanship."

26  220.   According to Ford, the "bumper to bumper" NVLW "lasts for three
27  years - unless you drive more than 36,000 miles before three years elapse. In that
28  case, your coverage ends at 36,000 miles," if not longer.

221.   Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Tennessee Plaintiff and members of the Tennessee Sub-Class purchased or leased the Class Vehicles with the defective Transmission and/or related components.

222.   Tennessee Plaintiff and members of the Tennessee Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Tennessee Plaintiff and members of the Tennessee Sub-Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Transmission Defect.

223.   Ford breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

224.   Privity is not required here because Tennessee Plaintiff and members of the Tennessee Sub-Class are intended third-party beneficiaries of contracts between Ford and its distributors and dealers, and specifically, of Ford's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

225.   Any attempt by Ford to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because Ford knowingly sold or leased defective products without informing consumers about the Transmission Defect.

The time limits are unconscionable and inadequate to protect Tennessee Plaintiff and the members of the Tennessee Sub-Class. Among other things, Tennessee Plaintiff and members of the Tennessee Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Ford and unreasonable favored Ford. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Transmission Defect existed between Ford and members of the Tennessee Sub-Class.

226. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Tennessee Plaintiff and the members of the Tennessee Sub-Class whole, because Ford has failed and/or has refused to adequately provide the promised remedies, *i.e.*, a permanent repair, within a reasonable time.

227. Tennessee Plaintiff was not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Transmission Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

228. Nonetheless, Tennessee Plaintiff and members of the Tennessee Sub-Class provided notice to Ford of the breach of express warranties when they took their vehicles to Ford-authorized providers of warranty repairs. Tennessee Plaintiff also provided notice to Ford of its breach of express warranty by letter dated April 27, 2022.

229. As a result of Ford's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

230. As a direct and proximate result of Defendant's breach of express warranties, Tennessee Plaintiff and members of the Tennessee Sub-Class have been damaged in an amount to be determined at trial.

231. As a result of Ford's breach of the express warranty, Tennessee Plaintiff and Tennessee Sub-Class Members are entitled to legal and equitable relief against Ford, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## SIXTH CAUSE OF ACTION
### (Breach of the Implied Warranty of Merchantability)
### (TENN. CODE §§ 47-2-314 AND 47-2A-212)
### (On behalf of the Tennessee Sub-Class)

232. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

233. Tennessee Plaintiff brings this count on behalf of herself and Tennessee Sub-Class against Defendant.

234. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "seller" of motor vehicles under § 47-2-103(1)(d).

235. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

236. The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) AND 47-2A-103(1)(h).

237. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Tenn. Code §§ 47-2-314 and 47-2A-212.

238. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Tennessee

Plaintiff and members of the Tennessee Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Tennessee Plaintiff and members of the Tennessee Sub-Class, with no modification to the defective Class Vehicles.

239.   Ford provided Tennessee Plaintiff and members of the Tennessee Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their Transmissions suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

240.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

241.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Ford knew of this defect at the time these sale or lease transactions occurred.

242.   As a result of Ford's breach of the applicable implied warranties, Tennessee Plaintiff and members of the Tennessee Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Tennessee Plaintiff and

members of the Tennessee Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

243.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

244.   Tennessee Plaintiff and members of the Tennessee Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

245.   Privity is not required here because Tennessee Plaintiff and members of the Tennessee Sub-Class are intended third-party beneficiaries of contracts between Ford and its distributors and dealers, and specifically, of Ford's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

246.   Tennessee Plaintiff and members of the Tennessee Sub-Class were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of warranty would have been futile. Ford was also on notice of the Transmission Defect from the complaints and service requests it received from Tennessee Plaintiff and the Class Members and through other internal sources.

247.   Nonetheless, Tennessee Plaintiff and members of the Tennessee Sub-Class provided notice to Ford of the breach of express warranties when they took their vehicles to Ford-authorized provider of warranty repairs. Tennessee Plaintiff also provided notice to Ford of its breach of express warranty by letter dated April 27, 2022.

248.   As a direct and proximate cause of Ford's breach, Tennessee Plaintiff and members of the Tennessee Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Tennessee Plaintiff and members of the Tennessee Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

249.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Tennessee Plaintiff and members of the Tennessee Sub-Class have been damaged in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**(Violations of the Tennessee Consumer Protection Act)**
**(TENN. CODE ANN. § 47-18-101, *et seq*.)**
**(On behalf of the Tennessee Sub-Class)**

250.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

251.   Tennessee Plaintiff brings this count on behalf of herself and Tennessee Sub-Class against Defendant.

252.   Tennessee Plaintiff and members of the Tennessee Sub-Class are "consumers" as defined by the Tenn. Code Ann. § 47-18-103(2).

253.   Ford, Tennessee Plaintiff, and the Tennessee Sub-Class Members are "persons" within the meaning of Tenn. Code Ann. § 47-18-103(9).

254.   The Class Vehicles are "goods" within the meaning Tenn. Code Ann. § 47-18-103(5).

255.   Defendant was and is engaged in "trade," "commerce," and/or "consumer transaction[s]" within the meaning of Tenn. Code Ann. § 47-18-103(11).

256.   The Tennessee Consumer Protection Act ("CPA") provides that, "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices", including but not limited to, "(2) causing likelihood of confusion or misunderstanding as to the certification of goods

. . . ;" "(5) representing that goods . . . have . . . characteristics . . . uses, benefits . . . that they do not have;" "(7) representing that goods . . . are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;" "(9) advertising goods or services with intent not to sell them as advertised;" "(22) using any advertisement containing an offer to sell goods . . . when the offer is not a bona fide effort to sell the advertised goods . . . ;" "(27) engaging in any other act or practice which is deceptive to the consumer or any other person…" Tenn. Code Ann. § 47-18-104(a), (b).

257.   Ford engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Tennessee CPA.

258.   Ford participated in unfair or deceptive trade practices that violated the Tennessee CPA.   As described below and alleged throughout the Complaint, by failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Transmission Defect in the course of its business.

259.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

260.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

261.   Ford knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

262.   Ford knew or should have known that its conduct violated the Tennessee CPA.

      a. Defendant was under a duty to Tennessee Plaintiff and the Tennessee Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      b. Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

      c. Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

263.   Defendant actively concealed the defective nature of the Class Vehicles from Tennessee Plaintiff and the Tennessee Sub-Class Members at the time of sale and thereafter.

264.   By failing to disclose the Transmission Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

265.   The facts concealed or not disclosed by Defendant to Tennessee Plaintiff and the Tennessee Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's transmission is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Tennessee Plaintiff and the Tennessee Sub-Class Members known that the Class Vehicles suffered from the Transmission Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

266.   Tennessee Plaintiff and the Tennessee Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defect. That is the reasonable and objective consumer expectation for vehicles.

267.   As a result of Defendant's misconduct, Tennessee Plaintiff and the Tennessee Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

268.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Tennessee Plaintiff and the Tennessee Sub-Class Members have suffered and will continue to suffer actual damages.

269.   Ford's violations present a continuing risk to Tennessee Plaintiff and the Tennessee Sub-Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

270.   Tennessee Plaintiff provided notice of their claims, by letter dated April 27, 2022.

271.   Pursuant to Tenn. Code Ann. § 47-18-109, Tennessee Plaintiff and members of the Tennessee Sub-Class seek order enjoining Ford's unfair and/or deceptive acts or practices, damages, treble damages for willful and knowing violations, pursuant to § 47-18-109(a)(3), punitive damages, attorneys' fees, costs, and any relief available under the Tennessee CPA that the Court deems just and proper.

### EIGHTH CAUSE OF ACTION
**(Breach of Express Warranty)**
**(Tex. Bus. & Com. Code §§ 2.313 AND 2A.210)**
**(On Behalf of the Texas Sub-Class)**

272.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

273.   Plaintiff Eric Senkyrik ("Texas Plaintiff") brings this count on behalf of himself and the Texas Sub-Class against Defendant.

274.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

275.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

276.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

277.   The transmissions were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

278.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Ford's express warranty is an express warranty under Texas state law.

279.   In a section entitled "What is Covered," Defendant's express warranty provides, in relevant part, that "authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."

280.   According to Ford, the "bumper to bumper" NVLW "lasts for three years - unless you drive more than 36,000 miles before three years elapse. In that case, your coverage ends at 36,000 miles," if not longer.

281.   Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Texas Plaintiff and members of the Texas Sub-Class purchased or leased the Class Vehicles with the defective transmission and/or related components.

282.   The Texas Plaintiff and members of the Texas Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Texas Plaintiff and members of the Texas Sub-Class that the Class

Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Transmission Defect.

283.   Ford breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

284.   Privity is not required here because Texas Plaintiff and members of the Texas Sub-Class are intended third-party beneficiaries of contracts between Ford and its distributors and dealers, and specifically, of Ford's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

285.   Any attempt by Ford to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because Ford knowingly sold or leased defective products without informing consumers about the Transmission Defect. The time limits are unconscionable and inadequate to protect Texas Plaintiff and the members of the Texas Sub-Class. Among other things, Texas Plaintiff and members of the Texas Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Ford and unreasonable favored Ford. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Transmission Defect existed between Ford and members of the Texas Sub-Class.

286.   Further, the limited warranty promising to repair and/or correct a

manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Texas Plaintiff and the members of the Texas Sub-Class whole, because Ford has failed and/or has refused to adequately provide the promised remedies, *i.e.* a permanent repair, within a reasonable time.

287.   Texas Plaintiff was not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Transmission Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

288.   Nonetheless, Texas Plaintiff and members of the Texas Sub-Class provided notice to Ford of the breach of express warranties when they took their vehicles to Ford-authorized providers of warranty repairs. Texas Plaintiff also provided notice to Ford of its breach of express warranty by letter dated April 27, 2022.

289.   As a result of Ford's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

290.   As a direct and proximate result of Defendant's breach of express warranties, Texas Plaintiff and members of the Texas Sub-Class have been damaged in an amount to be determined at trial.

291.   As a result of Ford's breach of the express warranty, Texas Plaintiff and Texas Sub-Class Members are entitled to legal and equitable relief against Ford, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**NINTH CAUSE OF ACTION**
**(Breach of the Implied Warranty of Merchantability)**
**(TEX. BUS. & COM. CODE §§ 2.314 AND 2A.212)**
**(On behalf of the Texas Sub-Class)**

292.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

293.   Texas Plaintiff brings this count on behalf of himself and the Texas Sub-Class against Defendant.

294.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

295.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

296.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

297.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Texas Bus. & Com. Code §§ 2.314 and 2A.212.

298.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Texas Plaintiff and members of the Texas Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Texas Plaintiff and members of the Texas Sub-Class, with no modification to the defective Class Vehicles.

299.   Ford provided Texas Plaintiff and members of the Texas Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However,

the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their transmissions suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

300.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

301.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Ford knew of this defect at the time these sale or lease transactions occurred.

302.   As a result of Ford's breach of the applicable implied warranties, Texas Plaintiff and members of the Texas Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Texas Plaintiff and members of the Texas Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

303.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

304.   Texas Plaintiff and members of the Texas Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

305.   Privity is not required here because Texas Plaintiff and members of the Texas Sub-Class are intended third-party beneficiaries of contracts between Ford and its distributors and dealers, and specifically, of Ford's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

306.   Texas Plaintiff and members of the Texas Sub-Class were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of warranty would have been futile. Ford was also on notice of the Transmission Defect from the complaints and service requests it received from Texas Plaintiff and the Class Members and through other internal sources.

307.   Nonetheless, Texas Plaintiff and members of the Texas Sub-Class provided notice to Ford of the breach of express warranties when they took their vehicles to Ford-authorized providers of warranty repairs. Texas Plaintiff also provided notice to Ford of its breach of express warranty by letter dated April 27, 2022.

308.   As a direct and proximate cause of Ford's breach, Texas Plaintiff and members of the Texas Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Texas Plaintiff and members of the Texas Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

309.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Texas Plaintiff and members of the Texas Sub-Class have been damaged in an amount to be proven at trial.

1
2
3

**TENTH CAUSE OF ACTION**
**(Violations of the Texas Deceptive Trade Practices Act –**
**Consumer Protection Act)**
**(Texas Bus. & Com. Code § 17.41, *et seq*.)**
**(On behalf of the Texas Sub-Class)**

4
5

310.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

6
7

311.   Texas Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Texas Sub-Class.

8
9

312.   Ford is a "person" as that term is defined in Tex. Bus. & Com. Code § 17.45(3).

10
11
12
13
14

313.   Texas Plaintiff and the members of the Texas Sub-Class are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), *see* Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

15
16

314.   Ford is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

17
18
19
20
21
22
23
24

315.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3). Ford engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Texas DTPA.

25
26
27
28

316.   Ford participated in unfair or deceptive trade practices that violated the Texas DTPA. As described below and alleged throughout the Complaint, by failing to disclose the Transmission Defect, by concealing the Transmission Defect, by

marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Transmission Defect in the course of its business.

317.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

318.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

319.   Ford knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

    a. Ford knew or should have known that its conduct violated the Texas DTPA.

    b. Defendant was under a duty to Texas Plaintiff and the Texas Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    c. Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

320.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

321.   Defendant actively concealed the defective nature of the Class Vehicles from Texas Plaintiff and the Texas Sub-Class Members at the time of sale and thereafter.

322.   By failing to disclose the Transmission Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

323.   The facts concealed or not disclosed by Defendant to Texas Plaintiff and the Texas Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's transmission is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Texas Plaintiff and the Texas Sub-Class Members known that the Class Vehicles suffered from the Transmission Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

324.   Texas Plaintiff and the Texas Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defect. That is the reasonable and objective consumer expectation for vehicles.

325.   As a result of Defendant's misconduct, Texas Plaintiff and the Texas Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

326.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Texas Plaintiff and the Texas Sub-Class Members have suffered and will continue to suffer actual damages.

327.   Ford's violations present a continuing risk to Texas Plaintiff and the Texas Sub-Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

328.   Texas Plaintiff provided notice of their claims by letter dated April 27, 2022.

329.   Pursuant to Tex. Bus. & Com. Code § 17.50, Texas Plaintiff and members of the Texas Sub-Class seek an order enjoining Ford from engaging in unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

## ELEVENTH CAUSE OF ACTION
**(Breach of Express Warranty)**
**(FLA. STAT. § 672.313)**
**(On behalf of the Florida Sub-Class)**

330.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

331.   Plaintiff Michael Hogan ("Florida Plaintiff") brings this claim on behalf of himself and the Florida Sub-Class.

332.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles.

333.   Ford provided a New Vehicle Limited Warranty that expressly warranted Ford would repair any defects in materials or workmanship free of charge during the applicable warranty periods.

334.   The Florida Plaintiff and Florida Sub-Class Members experienced the Transmission Defect within the warranty period.

335.   Ford breached its warranty by failing to provide an adequate repair when Plaintiffs and Florida Sub-Class Members presented their Class Vehicles to authorized Ford dealers for repair of the Transmission Defect.

336.   The warranty formed the basis of the bargain that was reached when Florida Plaintiff and the Florida Sub-Class Members purchased or leased their Class Vehicles.

337.   As a result of Ford's breach of its express warranty, Florida Plaintiff and the Florida Sub-Class Members have suffered economic damages including,

but not limited to, the loss of the benefit of their bargain, loss of vehicle use, diminished value, substantial loss in value and resale value, out-of-pocket expenses for maintenance and service that they otherwise would not have incurred but for the Transmission Defect.

338. The Florida Plaintiff and Florida Sub-Class Members were not required to notify Ford of the breach or were excused from doing so because affording Ford a reasonable opportunity to cure its breach would have been futile.

339. The Florida Plaintiff and Florida Sub-Class Members provided Ford with notice of the issues complained of herein within a reasonable time by presenting their Class Vehicles to authorized Ford dealers for repair of the Transmission Defect. Ford also received notice of the issues complained of herein by numerous complaints made directly to Ford and online, and from internal sources. The Florida Plaintiff also gave Ford notice of its breaches of warranty by letter dated June 13, 2022.

340. Defendant has been afforded a reasonable opportunity to cure its breach, including when the Florida Plaintiff and Florida Sub-Class Members brought their vehicles in for diagnoses and repair of the Transmission system.

341. The Florida Plaintiff and Florida Sub-Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of such obligations as a result of Ford's conduct described herein.

342. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Ford to limit its express warranty in a manner that would exclude or limit coverage for the Transmission Defect, including benefit-of-the-bargain, incidental, or consequential damages, would cause the warranty to fail of its essential purpose. The Florida Plaintiff and Florida Sub-Class Members have presented their Class Vehicles to Ford's authorized dealers on numerous occasions and Ford has failed to remedy the Transmission Defect. As a result, the Florida Plaintiff and Florida Sub-Class Members are left with defective vehicles that pose

1    a safety hazard and do not function as intended and, therefore, have been deprived
2    of the benefit of their bargains.

3        343.   In its capacity as a supplier and/or warrantor, and by the conduct
4    described herein, any attempt by Ford to limit its express warranty in a manner that
5    would exclude or limit coverage for the Transmission Defect would be
6    unconscionable. Ford's warranties were adhesive and did not permit negotiations.
7    Ford possessed superior knowledge of the Transmission Defect, which is a latent
8    defect, prior to offering Class Vehicles for sale. Ford concealed and did not disclose
9    the Transmission Defect, and Ford did not remedy the Transmission Defect prior to
10   sale or lease (or afterward).

11       344.   As a direct and proximate result of Ford's breach of express warranties,
12   the Florida Plaintiff and Florida Sub-Class Members have been damaged in an
13   amount to be determined at trial.

**TWELFTH CAUSE OF ACTION**
**(Breach of Implied Warranty of Merchantability)**
**(FLA. STAT. § 672.314.)**
**(On behalf of the Florida Sub-Class)**

17       345.   Plaintiffs incorporate by reference the allegations contained in the
18   preceding paragraphs of this Complaint.

19       346.   The Florida Plaintiff brings this claim on behalf of himself and the
20   Florida Sub-Class.

21       347.   Ford is and was at all relevant times a "merchant" with respect to motor
22   vehicles pursuant to Fla. Stat. § 672.104.

23       348.   The Class Vehicles are "goods" pursuant to Fla. Stat. § 672.105.

24       349.   A warranty that the Class Vehicles were in merchantable quality and
25   condition arises by operation of law with respect to transactions for the purchase
26   and lease of Class Vehicles. Defendant provided the Florida Plaintiff and Florida
27   Sub-Class Members with an implied warranty that the Class Vehicles and their

28

components and parts are merchantable and fit for the ordinary purposes for which they were sold.

350. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles suffered from the inherent Transmission Defect at the time of sale and thereafter.

351. Privity is not required here because Florida Plaintiffs and members of the Florida Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

352. Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

353. The Florida Plaintiff and Florida Sub-Class Members were not required to notify Ford of the breach or were excused from doing so because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile.

354. Ford also had notice of the issues complained of herein by the presentation of the Florida Plaintiff's and Florida Sub-Class Members' Class Vehicles to authorized Ford dealers for repair of the Transmission Defect, numerous complaints made directly to Ford and online, and from internal sources. The Florida Plaintiff also gave Ford notice of its breaches of warranty by letter dated June 13, 2022.

355.   Defendant has been afforded a reasonable opportunity to cure its breach, including when the Florida Plaintiff and Florida Sub-Class Members brought their vehicles in for diagnoses and repair of the Transmission system.

356.   Because the Florida Plaintiff and Florida Sub-Class Members purchased their vehicles from authorized Ford dealers, the Florida Plaintiff and Florida Sub-Class Members are in privity with Ford since an agency relationship establishes privity for purposes of the breach of implied warranty claims. In addition, privity is not required because the Florida Plaintiff and Florida class members are intended third-party beneficiaries of Defendant's implied warranties.

357.   As a result of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.

## THIRTEENTH CAUSE OF ACTION
### (Violation of Florida Deceptive and Unfair Trade Practices Act)
### (FLA. STAT. § 501.201, *et seq.*)
### (On behalf of the Florida Sub-Class)

358.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

359.   The Florida Plaintiff bring this claim on behalf of himself and the Florida Sub-Class.

360.   Plaintiffs and the Florida Sub-Class Members are "consumers" within the meaning of Fla. Stat. §501.203 (7).

361.   Defendant engages in "trade or commerce" within the meaning of Fla. Stat. §501.203 (8) by offering for sale or lease the Class Vehicles to Plaintiffs and the Florida Sub-Class Members.

362.   By failing to disclose and concealing the Transmission Defect from the Florida Plaintiff and Florida Sub-Class Members, Ford violated Fla. Stat. §501.204 (1), by engaging in "[u]nfair methods of competition, unconscionable acts or

practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

363.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

364.   Ford knew that the Class Vehicles suffered from an inherent defect, were defectively manufactured or designed, or contained defective materials, and were not suitable for their intended use.

365.   Ford's acts and practices, described herein, are unfair in violation of Florida law because it violates Florida public policy and warranty laws requiring a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes.

366.   Ford acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner, in at least the following respects: promoted and sold or leased Class Vehicles it knew were defective; failed to disclose the Transmission Defect; failed to make repairs or made repairs and provided replacements that caused the Florida Plaintiff and the Florida Sub-Class members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers.

367.   As a result of the Transmission defect, the Florida Plaintiff and Florida Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' Transmissions are substantially certain to fail or have failed before their expected useful life has run.

368.   Ford had a duty to the Florida Plaintiff and Florida Sub-Class Members to disclose the Transmission Defect because: Ford was in a superior position to know the true state of facts about the safety defect in the Class Vehicles'

Transmission systems; and the Florida Plaintiff and Florida Sub-Class Members could not reasonably have been expected to learn or discover that their Transmissions had a dangerous safety defect until it manifested.

369.   In failing to disclose the Transmission Defect, Ford knowingly and intentionally concealed material facts and breached its duty not to do so. Had the Florida Plaintiff and Florida Sub-Class Members known that the Class Vehicles' Transmission systems were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

370.   The Florida Plaintiff and Florida Sub-Class Members are reasonable consumers who do not expect the Transmissions installed in their vehicles to exhibit the Transmission Defect.

371.   As a result of Ford's conduct, Plaintiffs and Florida Sub-class Members were harmed and suffered actual damages in that the Class Vehicles experienced and may continue to experience the Transmission Defect.

372.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, the Florida Plaintiff and Florida Sub-Class Members suffered and will continue to suffer actual damages.

373.   The Florida Plaintiff and Florida Sub-Class Members are entitled to equitable relief, actual damages, including the diminished value of their Class Vehicles, attorneys' fees and costs, and any other relief provided by law.

## FOURTEENTH CAUSE OF ACTION
### (Breach of Express Warranty)
### (NEB. REV. STAT. U.C.C. § 2-313 and 2A-210)
### (On behalf of the Nebraska Sub-Class)

374.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

375.   Sharon Jackson ("Nebraska Plaintiff") brings this claim individually and on behalf of the Nebraska Class against Ford.

376.   Ford is and was at all relevant times a "merchant" with respect to motor

vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

377.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

378.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

379.   In connection with the purchase or lease of one of its new Class Vehicles, Ford provides an express "New Vehicle Limited Warranty" ("NVLW") for a period of 36 months or 36,000 miles, whichever occurs first. This NVLW exists to cover repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Ford.

380.   Ford's NVLW formed a basis of the bargain that was breached when Plaintiff and the Nebraska Class members purchased or leased the Class Vehicles with Transmission Defects.

381.   Plaintiff and the Nebraska Class members experienced defects within the warranty period. Despite the existence of the NVLW, Ford failed to inform Plaintiff and the Nebraska Class members that the Class Vehicles contain defective transmissions.

382.   Privity is not required here because Nebraska Plaintiff and members of the Nebraska Sub-Class are intended third-party beneficiaries of contracts between Ford and its distributors and dealers, and specifically, of Ford's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

383.   Ford breached the express warranty promising to repair or adjust defects in materials or workmanship of any part supplied by Ford. Ford has not

1  repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles
2  materials and workmanship defects.

3       384.   Ford was provided notice of these issues within a reasonable time of
4  Plaintiffs' knowledge of the non-conforming or defective nature of the Class
5  Vehicles, by letter dated June 13, 2022,  complaints by Plaintiffs or Class Members
6  to Ford either orally or in writing, complaints to Ford dealerships, intermediate
7  sellers, or repair facilities either orally or in writing, presentation of the vehicles for
8  repair to dealerships or to intermediate sellers or repair facilities, countless
9  consumer complaints to NHTSA regarding the Defect that is the subject of this
10  Complaint, and/or by the allegations contained in this Complaint.

11       385.   As a direct and proximate result of Ford's breach of express warranties,
12  Plaintiff and the Nebraska Class members have been damaged in an amount to be
13  determined at trial.

14  **FIFTEENTH CAUSE OF ACTION**
15  **(Breach of Implied Warranty of Merchantability)**
   **(NEB. REV. STAT. U.C.C. § 2-314 and 2A-212)**
16  **(On behalf of the Nebraska Sub-Class)**

17       386.   Plaintiffs incorporate by reference the allegations contained in the
18  preceding paragraphs of this Complaint.

19       387.   Nebraska Plaintiff bring this Count on behalf of themselves and the
20  Nebraska Class Members.

21       388.   Ford is and was at all relevant times a "merchant" with respect to
22  motor vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and a "seller" of motor
23  vehicles under § 2-103(1)(d).

24       389.   With respect to leases, Ford is and was at all relevant times a "lessor"
25  of motor vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

26       390.   The Class Vehicles are and were at all relevant times "goods" within
27  the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

28

391.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Neb. Rev. St. U.C.C. §§ 2-314 and 2A-212.

392.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

393.   It was reasonable to expect that Plaintiffs and other Class Members may use, consume, or be affected by the defective vehicles.

394.   The transmissions in the Class Vehicles are inherently defective in that they stall, shudder, fail to accelerate and slip, thereby increasing the risk of serious injury or death.

395.   Plaintiffs and other Class Members were and are third-party beneficiaries to the Ford manufacturer's contracts with Ford-certified/authorized retailers who sold and leased the Class Vehicles to Plaintiffs and other Class Members

396.   Privity is not required here because Nebraska Plaintiff and members of the Nebraska Sub-Class are intended third-party beneficiaries of contracts between Ford and its distributors and dealers, and specifically, of Ford's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

397.   Ford was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Class Vehicles, by letter dated June 13, 2022, complaints by Plaintiffs or Class Members to Ford either orally or in writing, complaints to Ford dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for

repair to dealerships or to intermediate sellers or repair facilities, countless consumer complaints to NHTSA regarding the Defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

398.    As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**SIXTEENTH CAUSE OF ACTION**
**(Violation Of Nebraska Consumer Protection Act)**
**(NEB. REV. STAT. § 59-1601, *et seq*.)**
**(On behalf of the Nebraska Sub-Class)**

399.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

400.    Plaintiff Sharon Jackson ("Nebraska Plaintiff") brings this claim against Ford on behalf of herself and the Nebraska Subclass.

401.    Defendant, the Nebraska Plaintiff, and the Nebraska Subclass members are "person[s]" under the Nebraska Consumer Protection Act ("Nebraska CPA"), Neb. Rev. Stat. § 59-1601(1).

402.    Defendant's actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

403.    The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602. Defendant's conduct as set forth herein constitutes unfair or deceptive acts or practices.

404.    In the course of Defendant's business, Defendant willfully failed to disclose and actively concealed that the Transmissions and related components in the Class Vehicles are defective, as described above. Accordingly, Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when

they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

405.   In purchasing or leasing the Class Vehicles, Plaintiff and the other Subclass members were deceived by Defendant's failure to disclose that the Class Vehicles' transmissions were defective, as described above.

406.   Nebraska Plaintiff and the Nebraska Sub-Class Members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in multiple methods of deception. The Nebraska Plaintiff and Subclass members did not, and could not, unravel Defendant's deception on their own.

407.   Defendant's actions as set forth above occurred in the conduct of trade or commerce.

408.   Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

409.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Nebraska Plaintiff and the Subclass.

410.   Defendant knew or should have known that its conduct violated the Nebraska CPA.

411.   Defendant owed the Nebraska Plaintiff and the Subclass a duty to disclose the truth about the Transmission Defect because Defendant:

      a.     Possessed exclusive knowledge of the Defect;

b.   Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

c.   Made incomplete representations that the Class Vehicles are defective, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

412.   Defendant had a duty to disclose that the Class Vehicles' transmissions were defective because the Nebraska Plaintiff and the other Subclass members relied on Defendant's material representations that the Class Vehicles they were purchasing were safe and free from defects.

413.   Defendant's conduct proximately caused injuries to Nebraska Plaintiff and the Sub-Class.

414.   The Nebraska Plaintiff provided notice to Ford of its violation of the Nebraska CPA on June 13, 2022.

415.   Because Defendant's conduct caused injury to Nebraska Subclass members' property through violations of the Nebraska CPA, the Nebraska Plaintiff and the Nebraska Subclass seek recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining Defendant's unfair or deceptive acts and practices, court costs, reasonable attorneys' fees, and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

## SEVENTEENTH CAUSE OF ACTION
### (Unjust Enrichment)
### (On Behalf of the Nationwide Class)

416.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

417.   Plaintiffs bring this cause of action on behalf of themselves and the Class, or alternatively on behalf of the Sub-Classes.

418.   As a direct and proximate result of Defendant's failure to disclose known defects, Defendant has profited through the sale and lease of the Class

1   Vehicles. Although these vehicles are purchased through Defendant's agents, the
2   money from the vehicle sales flows directly back to Defendant.

3       419.   As a result of its wrongful acts, concealments, and omissions of the
4   defect in its Class Vehicles, as set forth above, Defendant charged a higher price for
5   their vehicles than the vehicles' true value. Plaintiffs and members of the Class paid
6   that higher price for their vehicles to Defendant's authorized dealers, which are in
7   Defendant's control. Defendant also reaps huge profits from the sales of its vehicles
8   through its authorized dealers.

9       420.   Additionally, as a direct and proximate result of Defendant's failure to
10  disclose known defects in the Class Vehicles, Plaintiffs and Class Members have
11  vehicles that require repeated, high-cost repairs that can and therefore have
12  conferred an unjust substantial benefit upon Defendant.

13      421.   Defendant has been unjustly enriched due to the known defects in the
14  Class Vehicles through the use money paid that earned interest or otherwise added
15  to Defendant's profits when said money should have remained with Plaintiff and
16  Class Members.

17      422.   As a result of the Defendant's unjust enrichment, Plaintiffs and Class
18  Members have suffered damages.

19                                   **PRAYER FOR RELIEF**

20      423.   Plaintiffs, individually and on behalf of all others similarly situated,
21  request the Court to enter judgment against Defendant, as follows:

22            (a) An order certifying the proposed Class, designating Plaintiffs as
23                named representatives of the Classes, and designating the
24                undersigned as Class Counsel;

25            (b) A declaration that Defendant is financially responsible for notifying
26                all Class Members about the defective nature of the Transmission,
27                including the need for periodic maintenance;

28            (c) An order enjoining Defendant from further deceptive distribution,

sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendant to remove, repair, and/or replace the Class Vehicles' defective Transmission with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Defendant from selling the Class Vehicles with the misleading information; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(d) An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(e) Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

(f) Any and all remedies provided pursuant to the causes of action and statutes alleged herein;

(g) A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles or make full restitution to Plaintiffs and Class Members;

(h) An award of attorneys' fees and costs, as allowed by law;

(i) An award of pre-judgment and post-judgment interest, as provided by law;

(j) Leave to amend the Complaint to conform to the evidence produced at trial; and

(k) Such other relief as may be appropriate under the circumstances.

CLASS ACTION COMPLAINT

1

## DEMAND FOR JURY TRIAL

2

      424.   Pursuant to Federal Rule of Civil Procedure 38(b) and Central District

3

of California Local Rule 38-1, Plaintiffs demand a trial by jury of all issues in this

4

action so triable.

5

6

Dated:  August 29, 2022                    Respectfully submitted,

7

                                        Capstone Law APC

8

                        By: /s/ Tarek H. Zohdy

9

                            Tarek H. Zohdy
                            Cody R. Padgett

10

                            Laura E. Goolsby

11

                            **BERGER MONTAGUE PC**

12

                            Russell D. Paul
                            (*pro hac vice forthcoming*)

13

                            Amey J. Park
                            (*pro hac vice forthcoming*)

14

                            Abigail J. Gertner
                            (*pro hac vice forthcoming*)

15

                            1818 Market Street
                            Suite 3600

16

                            Philadelphia, PA 19103
                            Tel: (215) 875-3000

17

                            Fax: (215) 875-4604
                            rpaul@bm.net

18

                            apark@bm.net
                            agertner@bm.net

19

                            *Attorneys for Plaintiffs*

20

21

22

23

24

25

26

27

28